Filed 9/23/25  Estate of Litchfield CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of Sherry A. Litchfield. | H051091, H051414 (Monterey County Super. Ct. No. 20PR000286) |
| CRAIG WALDMAN et al., Petitioners and Appellants, v. BRENT WALDMAN et al., Objectors and Respondents. | |

In this probate matter, two siblings dispute the validity of agreements between their mother (now deceased) and another sibling that affect trust property.  Craig Waldman and Jodi Shubin (Craig and Jodi,[1] or appellants), who are beneficiaries of the trust, challenge two contracts between their eldest brother, respondent Brent Waldman, and their mother, Sherry Litchfield, the trust's settlor and original trustee.

---

[1] For clarity, we refer to the parties and other family members by their first names as they appear in the briefs and record.  (See, e.g., *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 550, fn. 2.)

The agreements at issue are the third amendment to a 2001 promissory note documenting a loan by Sherry to Brent (Note), which Sherry later assigned to the trust, and a lease and right to purchase agreement (Agreement) for Sherry's primary residence, the principal trust asset. The Agreement allowed Brent, upon Sherry's death, to exercise a first right to purchase the residence at a specified price for the purpose of transferring it to his son (Sherry's grandson), respondent Chase Waldman.

After Sherry's death, appellants filed a Probate Code section 850 petition against Brent, Chase, and professional fiduciary Laurie Classen in her capacity as trustee (together, respondents), seeking the return of trust property, recission of the third amendment to the Note, and cancellation of the Agreement. The petition also asserted breach of fiduciary duty, financial elder abuse, and breach of contract claims against Brent.

After a bench trial, the trial court rejected appellants' claims. The court found that Brent had satisfied his burden at trial to demonstrate that the third amendment to the Note and the Agreement were fair and in good faith in all respects. The court rejected appellants' tort, contract, rescission, cancellation, and return of trust property claims and entered judgment in respondents' favor. In postjudgment proceedings on costs and attorney fees, the court awarded respondents attorney fees pursuant to fee clauses contained in the Note and Agreement. The court apportioned the fee awards to exclude fees incurred in connection with appellants' financial elder abuse claims.

Appellants have separately appealed from both the judgment on the petition and the postjudgment order on costs and fees. As explained further below, we reject appellants' challenges to the judgment but reverse the costs and fees order and remand with directions.

2

# I. FACTS AND PROCEDURAL BACKGROUND

*A. Facts*[2]

    1. Sherry Litchfield Trust

Sherry was born in March 1935 and had four children with her first husband, David Waldman. From oldest to youngest, the children are Brent, Todd,[3] Jodi, and Craig.

Sherry was a businesswoman for much of her life and owned several small businesses, including an art cooperative storefront in Pacific Grove and multiple residential care homes. After her second divorce, Sherry purchased a home located on Sierra Vista Drive in Monterey, California (Sierra Vista) and lived there for decades while raising her children. Sherry's children, as well as friends and acquaintances who testified at trial, described Sherry as strong-willed, alert, and astute.

In 2003, Sherry created the Sherry A. Litchfield 2003 Revocable Trust as part of her individual estate plan. The trust included Sierra Vista as a scheduled asset. Sherry amended the trust in 2015, naming Brent and Jodi as first successor cotrustees. In January 2019, Sherry further amended the trust, designating Laurie Classen as the first successor trustee and retaining Brent as second successor trustee. Apart from a bequest for the care of Sherry's pets, the 2019 trust amendments made Sherry's children equal beneficiaries of all assets under the trust.

---

[2] The factual background is drawn from the trial court's written statement of decision, the trial testimony and exhibits, and the record on appeal. "We recite the essential relevant facts 'in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent[s].' " (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2.) We describe conflicting evidence where relevant to each side's contentions regarding the sufficiency of the evidence to support the claims in the appeal.

[3] Todd is not a party to these appeals.

In June 2016, Sherry moved from Monterey to Santa Rosa to be closer to her daughter Jodi. Sherry purchased a condominium in the same building as Jodi. Sherry lived in Santa Rosa for about one year before deciding to return to Monterey. In 2017, Sherry sold the Santa Rosa condominium and purchased a home in Carmel Valley in a senior community called Hacienda Carmel, where she had several close friends. Sherry lived at Hacienda Carmel until her death in April 2020.

### 2. Family Background

Sherry loved each of her children and communicated frequently with them, as evidenced by the e-mails and letters presented at trial. However, longstanding conflicts and differences between the children, marked in particular by Craig's animosity toward Brent, impacted the family dynamic and injected discord into Sherry's decisions concerning her estate.

Brent moved to Carmel in 1978 and works in real estate as a real estate broker and commercial property developer. In 1980, Sherry granted Brent power of attorney. Jodi moved to Santa Rosa in 1990 and works in sales for a payroll company. Craig moved to Sacramento in 1986 and has a background in real estate as a licensed real estate agent and broker.

Chase is one of Sherry's many grandchildren. In late 2015, Chase, who worked as a golf caddie at Pebble Beach, moved into Sierra Vista at Sherry's invitation. He paid $300 per month in rent and lived in the smaller downstairs unit while Sherry lived upstairs.

### 3. Note and Third Amendment

Appellants challenge the third amendment to the Note. The Note, originally executed by Sherry and Brent in July 2001, consolidated several earlier loans made by Sherry to Brent. The Note stated a principal amount owed of $417,010.68, with an initial interest rate of 8 percent and payoff date

of July 1, 2009. The terms of the Note provided that Brent would maintain a life insurance policy "in no less than the ongoing current principal balance" and that Brent and Sherry would meet annually to discuss the payment schedule. The Note also contained provisions for unpaid interest, default, and attorney fees "[s]hould suit be commenced or an attorney employed to enforce the payment of th[e] note." In October 2016, Sherry assigned her 100 percent interest in the Note to her trust.

Amendments to the Note in 2007 and 2012 (not at issue on appeal) extended the payoff date to July 2017 and lowered the interest rate but retained the monthly payment amount of $2,250. In early 2016, Brent and Sherry began discussing a third amendment to the Note in connection with Sherry's move to Santa Rosa.

On June 1, 2016, Brent e-mailed Sherry to suggest they update the Note, which had been the subject of ongoing discussions between them. Brent drafted a third amendment reducing the interest rate to 3.5 percent, effective June 1, 2016, and extending the due date to an undetermined date. Sherry responded that she recalled previously discussing the rate adjustment but "knew nothing about extending" the Note and was "rapidly going through [her] [financial] cushion."

In a follow-up e-mail, Brent reminded Sherry of their discussions about modifying the Note and stated that he needed clarity about his obligations so he could plan appropriately for payments on the Note while financially assisting Chase with improvements to the Sierra Vista home. Brent and Sherry had several subsequent communications about the amendment to the Note. Sherry confirmed that she wanted the extension of the Note and the Sierra Vista transaction (which later culminated in the Agreement at issue in this appeal), stating "As long as I feel secure, this is all very overwhelming to

me, but want it to work. I Love the house and want it to be loved." In October 2016, Sherry discussed the amendment with attorney Daryl Reese (who was advising her on the lease purchase agreement, which was also under discussion). Reese's handwriting appears on the draft, and Reese later testified that although he did not recall the details, the Note "was being essentially amended to reflect . . . the objectives that [Sherry and Brent] had moving forward with their agreement."

In January 2017, in connection with their discussions about finalizing the Agreement, Brent made an extra principal reduction payment of $6,000. He e-mailed Sherry an "[a]mortization update" informing her that the interest rate on the Note was reduced to 3.5 percent, effective August 1, 2016, and the payoff amount (due July 1, 2017, assuming no extension) was $179,491.61. In May 2017, Brent made an additional principal reduction payment of $6,000.

Sherry began to consider moving back from Santa Rosa to the Monterey area in January 2017. In e-mails sent on July 6 and 7, 2017, from Sherry to Brent, Sherry conveyed her desire to leave Santa Rosa and return to Monterey. She demanded repayment of the Note. Sherry emphasized that she wanted the Note paid so she could choose whether to buy or rent a house upon her return. She wrote to Brent, "sell a couple cars or Bear Valley.[4] I just want it DONE!" Sherry sent additional e-mails to Brent, which she also forwarded to her son Craig, reiterating her demand that the Note be paid and threatening to contact a lawyer if Brent did not respond.

In December 2017, Sherry completed the sale of her condominium in Santa Rosa and moved to Hacienda Carmel. In a handwritten letter from March 2018 addressed to Brent that she showed to Craig but never sent to

---

[4] "Bear Valley" refers to a condominium owned by Brent.

Brent, Sherry wrote "I know you extended the [Note] to 2018 and I said no I wanted it paid off. It feels like you ignore my wishes about finances. I want the [Note] DONE! I have said it many times."

After Sherry moved to Hacienda Carmel, Brent saw her on a regular basis. Brent testified that notwithstanding her demands that the Note be paid off, Sherry appreciated the income it provided and "was at peace" with their arrangement. Nevertheless, Sherry "was attempting to pacify Craig and sometimes . . . Todd because they constantly were attempting to run her life by committee and she did not like that." E-mails between Sherry and Brent reflect Sherry's concern about what she called "static from siblings" about the transactions. After confirming in July 2018 that Brent's siblings had not given him "any more static," Sherry asked Brent for several items she wanted in preparation for a meeting with her attorney to update her will and trust. One of the items she requested was a copy of the third amendment. Brent provided her with a copy, signed by him, with an effective date of June 1, 2016.

Some weeks later, on August 13, 2018, Sherry signed the third amendment to the Note and placed a copy in her safe, where the trustee found it after Sherry's death. The executed third amendment to the Note reduced the interest rate from 6 percent to 3.5 percent, effective June 1, 2016, and extended the due date to November 30, 2019. The monthly payment amount of $2,250.00, including principal and interest, and all other terms and conditions remained the same.

The Note remained outstanding when it came due in November 2019. In December 2019, Brent proposed a fourth amendment to extend the note by one more year to November 30, 2020. Sherry told Brent she wanted to wait until after the holidays to sign it. While awaiting the extension, in January

7

2020 Brent made an extra principal reduction payment of $7,750. The fourth amendment to the Note remained unsigned when Sherry died in April 2020.

### 4. Sierra Vista and the Lease Purchase Agreement

As described *ante*, in early 2016, Sherry decided that she would move out of Sierra Vista to a condominium in Santa Rosa to be near her daughter Jodi. Sherry obtained a market value estimate of Sierra Vista from a friend and local realtor based on comparable properties; the realtor concluded Sierra Vista had a market value of $745,000 to $759,000.

Jodi arranged for her close friend Kerrie Chambers, who worked in mortgage lending, to help Sherry obtain financing for the Santa Rosa purchase. Chambers indicated in a February 2016 e-mail to Jodi, Brent, and Sherry, that Sherry could qualify for a loan and would need income verification, including a copy of the Note showing that the income to Sherry "will continue for [three] years."

Jodi also connected Sherry with William Robotham, a well-regarded certified public accountant (CPA) at the firm where Jodi worked, to advise Sherry on the tax consequences of a possible sale of Sierra Vista. Robotham indicated that Sherry would pay approximately $177,500 in capital gains tax on a sale of the house. After obtaining Robotham's input, Jodi informed Brent in late March 2016 that "[i]t might be a good idea to have mom rent her house. It will cover her costs in Santa Rosa and eliminate capital gains."

Sherry began investigating options to rent Sierra Vista and obtained quotes from local vendors for necessary structural repairs. She told Brent she could probably get $4,000 per month but would need some guidance about how to structure a lease. She researched hiring a rental management company but decided against it based on cost and the work required to prepare the house to rent. By May 2016, Sherry was considering how to keep

Sierra Vista in the family and avoid the need for a management company or payment of capital gains taxes.

Sherry, Brent, and Chase met several times beginning sometime in May 2016 to discuss Chase managing the rental of Sierra Vista and to draft a purchase option for Chase to eventually own Sierra Vista. Sherry indicated that she wanted the fair market price, as well as fair market rent for the home. She expressed concern about how to "explain it to everyone" and stated she did not "want static from anyone," since "the house is the only thing in [her] estate to go to [her] [f]our children" and Brent still owed her money on the Note.

Sherry and Brent exchanged e-mails in May 2016 regarding a lease purchase option for Sierra Vista. Brent proposed a plan to amend the Note and structure an agreement for Sierra Vista that would allow Sherry to avoid capital gains taxes. In addition, Chase, with Brent's financial help, would cover the repairs and rental of the home and would ultimately purchase and take title of it. Brent emphasized in an e-mail that Sherry "could consult with anyone" she thought would be appropriate before making "final decisions on how, or if, [she] want[ed] to proceed" and that she should take her time before deciding to address "any discomfort or . . . unanswered questions." Sherry responded, "Perfect."

Chase concurrently researched rental rates for the upstairs and upgrades that might be needed to rent out the home. Sherry obtained an appraisal of Sierra Vista in late May 2016, performed by certified appraiser, Thomas Loorz. Loorz's appraisal report stated that the appraisal was to assist in an intra-family sale, noted extensive signs of settlement to the foundation, and provided an estimated fair market value for Sierra Vista of $780,000.

In June 2016, Sherry moved to Santa Rosa. Although they had not reached a final agreement about the property, Chase began working on the improvements to Sierra Vista, including renovating the upstairs to market it for rent. Brent and Sherry communicated by e-mail about adjusting the interest rate on the Note and potentially extending it. Brent stated that he needed "to be clear on [her] intentions" for the Note, which would affect whether he could take on the new financial obligation of helping Chase with Sierra Vista.

Sherry confirmed her desire to move forward on an amendment to the Note and an agreement for Sierra Vista "[a]s long as [she] fe[lt] secure," noting she loved her house and "want[ed] it to be loved." Brent provided an updated "draft for discussion" (capitalization omitted) that set forth the concept of transferring Sierra Vista to Chase through Brent to avoid a property tax reassessment, proposed a purchase price of $800,000 based on the $780,000 appraisal from May 2016 and a payment schedule, and outlined tax considerations and additional discussion items.

In August 2016, Brent summarized their discussions in a nonbinding agreement, which he shared with Sherry, Jodi, and Chase. Jodi forwarded the draft to Robotham and requested his advice on the tax issues, stating "My brother and nephew are purchasing my mom[']s house. We need your help to make sure we are handling everything in the best interest of all parties."

Brent stated in a subsequent e-mail to Robotham, Jodi, Sherry, and Chase that it was "clear that we really need my [m]om's legal counsel to amend her estate documents and document the intentions of the parties on this transaction" and that legal counsel would "know exactly what we need to do to finalize the process." Roy Johnston, Sherry's estate planning attorney, referred Sherry to his associate Reese to advise her on the transaction. Brent

10

(who had Sherry's power of attorney) asked Sherry for her permission to work directly with Reese, and Sherry agreed.

In October 2016, Brent and Reese communicated about structuring the lease purchase agreement for Sierra Vista. Brent copied Sherry and Chase on his e-mail communications with Reese. Sherry told Brent in an e-mail that she had informed Craig about the discussions and offered to provide him the paperwork on the transaction. Craig wrote to her asking "Why are you selling your house so cheap?" She responded that she "[h]ad it appraised by a pro" and explained that the "market is not great" and "the real estate agent that was going to list it wanted [her] to do too much and spend a lot of $$$."

In late October 2016, Sherry met by herself with attorney Reese to discuss the terms of the Sierra Vista transaction. Reese understood that Sherry needed a steady stream of income and intended the transaction to be beneficial to all the family, with the house ultimately going to Chase through Brent to preserve its property tax rate. Reese prepared a draft of the lease purchase agreement and circulated it to Brent and Sherry for their review. Reese also consulted with Johnston, his senior attorney, to review the structure of the draft agreement.

In a subsequent e-mail to Sherry, Reese emphasized his "utmost concern" was to protect her interests as his client and stated they needed to address the proposed provision that would convert the balance due on the Note to the trust upon her passing. Reese explained that the provision would prevent the trust from being able to be closed upon the distribution of trust assets, as the trust would need to remain open and file yearly tax returns until the Note matured, or would require the creation of individual promissory notes for each remaining trust beneficiary. Reese opined that

11

both options were problematic. Sherry forwarded Reese's e-mail to Brent, who suggested they have an in-person meeting.

On January 10, 2017, Reese met with Sherry, Brent, Chase and Jodi, after which Reese made additional revisions to the lease purchase agreement. Prior to the meeting, Craig sent an e-mail to Sherry (copying Jodi and Todd) suggesting she reconsider the plan. Craig told Sherry there was "no good reason" for her to sell the house and warned her the agreement she was making with Brent and Chase was " 'extremely odd and fishy,' " pointing out that they were buying the house "with no money down and very poor credit" and suggesting that she hire a property manager to manage the rental and, should she choose to sell, require a downpayment of at least 10 to 25 percent.

The tenor of the January 10, 2017 meeting and demeanor of the parties was the subject of disputed testimony at trial.[5] Although Reese testified that the revised version of the agreement following the meeting was consistent with Sherry's wishes, he believed that she consented to the agreement based on her reliance on Brent's advice.

Five days after the January 10, 2017 meeting, Sherry e-mailed Chase expressing a desire to return to Sierra Vista. The lengthy e-mail touched on several topics, including her relationship with Jodi and the difficulty of remaining in Santa Rosa, her new life perspective since being treated for

---

[5] Reese testified at his deposition that Sherry appeared " 'exasperated' " at the January 10 meeting and that she had not been in agreement with all of the terms but at Brent's persuasion seemed to " 'resign[] herself to the agreement.' " Brent testified that all parties at the meeting, including Sherry, asked questions, and that apart from an outburst from Jodi, the meeting was cooperative and the four family members went to lunch together afterwards. In its statement of decision, the trial court explicitly discredited Reese's testimony about his subjective impressions of the January 10 meeting.

atrial fibrillation and her desire to be back in Monterey, and the idea that she (Sherry) might be able to sell the Santa Rosa condominium and purchase a home in Hacienda Carmel. Sherry asked Chase to help her think of a plan to address the financial arrangement between them if she were to move back, since he could not purchase Sierra Vista until she died. She assured him "nothing will change on you being able to buy it" and asked for his input, ending with "I LOVE you and your dad, so let's make it work [heart] GRAMA."

Chase replied on January 16, 2017. In a lengthy e-mail, Chase recognized Sherry's desire to leave Santa Rosa and make a plan to return to Sierra Vista but pointed out that they needed to honor the lease that was in place for the upstairs, which went through September, and questioned how losing the rental income would impact Sherry financially and how they would address the renovations and upgrades he and his father had made to the property for leasing purposes. Chase emphasized that in his view the plan for Sierra Vista seemed to be working very well and her desire to move back seemed sudden but also stated he wanted to "make things work" for her and emphasized his and his father's love and affection for her.

Less than two weeks later, on January 24, 2017, Reese e-mailed Sherry, Brent, and Chase a revised draft of the lease purchase agreement, which is the version of the Agreement challenged by appellants. Brent signed two copies of the Agreement and sent them to Sherry, who signed the Agreement sometime in March 2017 and returned one copy to Brent. Sherry placed the other copy in her safe, where trustee Classen found it after Sherry's death, together with a signed copy of the Note and amendments.

The pertinent terms of the Agreement provide that Sherry, owner of Sierra Vista, grants to Brent the right to lease the property, with a first right

13

to purchase the property, according to the stated terms and conditions. Under paragraph No. 1, Brent's right to purchase would not vest until Sherry's death.

Paragraph No. 2 states that good and valuable consideration for the first right to purchase the property includes:  a. expenses of approximately $80,000, incurred by Brent to renovate, upgrade, and remodel the property; b. base monthly rent of $1,961.46, to be paid by Brent to Sherry, beginning on August 15, 2016, and continuing throughout the first 12 months of the agreement; c. additional monthly rent of $1,058.81, to be paid by Brent to Sherry, beginning on August 15, 2017, and continuing each month thereafter throughout the agreement term; d. Brent's assumption of responsibility, beginning August 1, 2016, for the current principal balance of $126,501.76 on Sherry's Provident Credit Union loan, with Brent paying the monthly mortgage directly to Provident "until paid in full"; and e. Brent's assumption of responsibility "[t]hroughout the term of this [a]greement" for timely payment of all property taxes, fire, and liability insurance premiums on the property.

Subparagraphs c. and d. further state that if Brent exercises his right to purchase, those amounts (the additional monthly rent payments of $1,058.81, and principal balance reduction on the mortgage attributable to his payments to Provident), shall be applied toward the purchase price for the property.

Paragraph No. 6 sets the purchase price, should Brent exercise his right to purchase, at $800,000.  It provides, in subparagraph (a), "The consideration paid for the right to purchase as enumerated in [p]aragraph [No.] 2 shall be credited against the purchase price," excluding any amounts

14

under paragraph No. 2.a.[6]  Subparagraph b. of paragraph No. 6 further provides that upon Sherry's death, the balance due under the purchase price "shall be converted to a promissory note at 3.5% interest per annum, from [Brent] to [Sherry's trust], for the remaining time then existing under the terms of this [a]greement."

Other provisions address, inter alia, escrow after exercise of the right to purchase, and integration and severability, and grant Brent the right to assign the Agreement to Chase, and costs and fees to enforce the Agreement.

5.  Sherry's Move to Hacienda Carmel

In November 2017, Sherry sold her Santa Rosa condominium at a profit and purchased the Hacienda Carmel condominium, where she lived until her death.  Sherry ratified a December 2017 addendum to the Agreement which did not change any of its terms but clarified the monthly total Sherry was receiving from Brent ($4,237.09, comprising "monthly rent of $3,020.27, plus the subject property's [taxes and insurance] of $1,216.82").  As she waited for escrow to close on her Hacienda Carmel purchase, Sherry expressed to Todd her appreciation for Brent's help "getting it all done."

In February 2018, Brent distributed via certified mail a copy of the Agreement to Sherry and his siblings after Sherry told him that Craig said he had never seen it.  In heated e-mails from Craig to Sherry in March 2018, Craig criticized the Agreement as "[a]bsolute insanity," told Sherry that Brent had tricked and taken advantage of her,[7] asserted Brent was "a

---

[6] We discuss the apparent inconsistency between paragraph Nos. 6.a. and 2.b.–2.d. in our analysis, *post* (pt. II.B.3.).

[7] Craig wrote that he had "not even fully read the contract but [was] fully and completely disgusted by its unfair and unethical content to [Sherry's] detriment."  Among the concerns he highlighted were (1) purchase price reductions based on improvements and mortgage payments,

15

crooked, selfish, greedy[,] morally broke person" who may have committed financial elder abuse against her, and recommended that she cancel the contract, sell Sierra Vista "to a REAL buyer who gets a REAL loan and pays you REAL money," and collect the outstanding Note money from Brent. In a follow-up e-mail, Craig suggested to Sherry that she could void the agreement because she had "health/heart issues [and] did not have a clear head" and outlined a proposed plan for Sherry to follow that he maintained would be "fair, reasonable and easy" without requiring an attorney.

Sherry handwrote a letter to Brent that reflected Craig's suggestions, but she did not send the letter to Brent. Instead, she e-mailed a photo of the letter to Craig and told him she could give it to her daughter-in-law to type. Craig continued to write to Sherry about the need to remove Brent from any executor role (stating he "will rob us all blind" and "Chase will never see this house"). Contemporaneous e-mails from Jodi and Todd urged Craig to allow their mother to make her own decisions regarding her estate and enjoy her time back in Carmel. For example, Todd wrote to Craig, "Ultimately all of this is a choice mom will have to make. She told me to disengage with respect to the terms and conditions [] between her and any of our siblings. She therefore has all the information she needs to make an informed decision . . .. [¶] . . . [¶] . . . [T]he most importing thing is mom seems very content being back in Carmel. . . . Best she enjoys her time watching the sun rise in a peaceful valley."

---

(2) agreement timeline of "years" that could be extended by the buyer, (3) Chase's ability to purchase was in Brent's control and Brent "probably won't allow it, too greedy," and (4) the 3.5 percent fixed interest rate for an *unknown* term was far below market rate. Craig further added that if Sherry's intent was to "give Brent" the house while "screwing your other three kids out of everything then [she] certainly ha[d] accomplished the task."

16

Sherry and Brent continued to discuss the Sierra Vista transaction, and in an April 2018 e-mail, Sherry demanded that Brent pay off the Note and indicated she was "DONE! Want to Not have any more Banter about My money. [Heart] or S[ierra] V[ista]." In his response, Brent emphasized his efforts during the last two years to support Sherry's decisions, asserted that "[w]e made a damn good plan for you so that you are secure at your new home and that you have the cash flow you need to enjoy everything you would like to do," and stated he was "proud of [his] work in that regard and how you are very comfortable and right around the corner from us if you need anything."

In an e-mail in May 2018, Brent reminded Sherry that they had a signed agreement that her lawyer had prepared and that "Chase has honored his side of the Agreement" by making all payments prior to the monthly due dates. He asked Sherry to include Chase in conversations concerning the Agreement, which affected him directly, and to set up a time for the three of them to meet and discuss any changes she was seeking. Craig and Sherry continued to exchange barbs in e-mails based on their political differences. After an apparent hiatus in these exchanges, Sherry e-mailed Brent in early July 2018 asking if he "had any more static from siblings?" to which Brent responded, "No [¶] They have not contacted me. [¶] This has been put to rest."

In November 2018, Sherry met with Classen about her work as a professional fiduciary. Sherry told Classen that she was interested in her services because her family did not get along and she thought it best to get a neutral trustee. Sherry met again with Classen in January 2019 and discussed her assets. Sherry told Classen that she had her home in Hacienda Carmel, the Note, and the Sierra Vista home. Regarding Sierra Vista, Sherry

told Classen "that's all been taken care of, . . . [her] grandson is buying it." Shortly after, Sherry amended the trust naming Classen as first successor trustee.

In further text and e-mail exchanges in December 2018, Sherry told Brent she was thinking about removing Craig and Jodi from the trust and gifting their portions to charities, and asked for his input. Brent encouraged her to be patient and "not focus on the temporary negativity of recent events" but to "[k]eep extending the olive branch and I suspect you may see them soon." He added, "I know you'll figure this out on your own. I hope my comments help." Sherry sent Craig a five-page handwritten letter reflecting on her life history and their family dynamics, expressing her love for him, asking that they try to heal their rifts, and pleading that he allow her to have her individual relationships with his siblings. She wrote, "My estate is so minute to all of you. I don't understand why it has any issues." She implored Craig to keep their relationship to "Mom and Craig" and allow her and his siblings to have their separate relationships, closing with "And let this final chapter in 'My Book of Life' be empty of tears and heartache."

6. Exercise of the Agreement

After Sherry's death on April 26, 2020, successor trustee Classen went through Sherry's home and personal effects. Classen found a signed copy of both the Note (including amendments) and the Agreement in Sherry's locked safe.

On May 1, 2020, Brent notified Classen as successor trustee that he had elected to exercise his right to purchase Sierra Vista pursuant to the Agreement. Due to vehement opposition expressed by the other beneficiaries of the trust (Craig, Jodi, and Todd), Classen served a notice of proposed action on May 15, 2020, to the beneficiaries stating that the trustee would

18

sell Sierra Vista to Brent based on the Agreement. On May 22, 2020, Classen sent another notice of proposed action that the trustee would amend the due date of the Note to November 30, 2020.

Classen obtained a date of death appraisal of Sierra Vista and prepared a date of death balance sheet showing Sherry's assets. These included approximately $47,400 in her checking and savings account, the Sierra Vista and Hacienda Carmel properties (appraised at $890,000 and $550,000, respectively), and the balance of the Note for $103,576.60. On June 5, 2020, Craig, Jodi, and Todd objected to the notices of proposed action. Craig and Jodi initiated this action shortly thereafter.

*B. Procedural History*

1. Probate Code Section 850 Petition

Craig and Jodi filed their initial Probate Code section 850 petition in July 2020 and their first amended petition and operative pleading (hereafter, petition) on June 8, 2021.

The petition sought in count 1 the return of trust property based on allegations of wrongdoing by Brent. It alleged in counts 2 through 7 separate counts of financial elder abuse and breach of fiduciary duty as to the Agreement and the Note and requested cancellation of the Agreement and recission of the third amendment to the Note. The petition further alleged, in the alternative, two counts of breach of contract as to the Note (count 8, under the April 4, 2012 (second) amendment, and alternatively, count 9, under the June 1, 2016 (third) amendment) by failing to pay the amounts owed under it. The petition named Chase as a respondent because he resides at the subject property and has a claim of right under the Agreement as an assignee. It named Classen "solely in her capacity as trustee" and, according to appellants, solely as a nominal respondent.

19

## 2. Trust Administration Pretrial

In December 2020, in response to the initial petition, Classen filed a declaration in her capacity as trustee of Sherry's trust, stating she did so as "a necessary party to this dispute and to assist in its resolution." Classen addressed the "facts and issues relating to" the payoff date of the Note and the disputed issue of Brent's purchase of Sierra Vista pursuant to the Agreement.

Classen declared, regarding the changes to the Note, that Brent requested the June 1, 2016 extension of the Note to November 30, 2019, but "[f]or whatever reason, [Sherry] did not sign the requested amendment until August 13, 2018." Regarding Brent's proposed December 17, 2019 amendment to further extend the payoff date to November 30, 2020, Classen stated that Sherry "did not sign this proposed amendment to the [] Note before she died." After Sherry died, Brent requested that Classen sign the December 17, 2019 proposed amendment. Due to her concerns about a potential dispute among the trust's beneficiaries over the proposed extension, Classen served a notice of proposed action regarding her execution of the proposed amendment. Classen declared that she supported extending the payoff date because it had been proposed to Sherry before she died and the timing of the payment "did not create any problems for the [t]rust."

Jodi, Craig, and Todd objected to the notice of proposed action. In addition to filing formal written objections, Jodi and Craig requested verification that Brent had made correct and timely payments on the Note. Classen explained that "[f]or the years 2000 through 2011, independent, supporting documentation from [Sherry's] banks was not available," and Classen "was therefore not able to independently verify, through bank records, that each and every payment due under the [] Note prior to 2012 was

20

correct and timely made." Classen was able to verify Brent's payments from 2012 through 2020, based on Sherry's bank statements and Brent's amortization schedules.

Classen declared that on November 20, 2020, Brent paid off the Note in full by making a cash payment of $17,537.32, and by the trustee applying a credit to Brent of his share of equity from the transfer of Sherry's Hacienda Carmel home to Brent's siblings. She stated that because the Note has been paid off, the disputed issue of extending the payoff date "appears to be moot, unless Jodi [] and Craig [] can demonstrate that Brent [] owes the [t]rust more money under the [] Note."

Appellants' accounting expert Robert Ward, a CPA, reviewed the Note and payment records to evaluate the trustee's determination that the Note had been paid off. Although Ward concluded in his initial review that a balance remained on the Note, adjusted calculations based on Brent's discovery of two prior payments that had been inadvertently left off of the payment ledger led Ward to conclude that Brent had paid the Note in full and slightly in excess.

With regard to the Agreement, Classen declared that on May 15, 2020, after receiving Brent's notice of his exercise of his right to purchase the trust's Sierra Vista property, she issued a notice of proposed action to be served on all trust beneficiaries. Craig, Jodi, and Todd objected to the notice of proposed action, with Jodi and Craig serving formal objections on the trustee's counsel. Classen stated that she had "researched and confirmed" that all payments under the Agreement had been timely made to the trust (including property taxes and fire and liability insurance premiums), the date of death appraisal for Sierra Vista was $890,000, and the sales price for Sierra Vista pursuant to the Agreement was $800,000.

21

Classen declared that due to the beneficiaries' objections, the escrow company had informed her it will not close escrow for the Sierra Vista transaction until it receives either a court order authorizing the sale, or all objecting beneficiaries withdraw their objections. Classen stated that she was not opposed to the sale of Sierra Vista to Brent under the Agreement but did oppose the provision that allowed Brent "to keep the current mortgage, in favor of Provident Credit Union (Provident) and secured by [] Sierra Vista Drive, in place until its scheduled payoff date in 2038." Classen noted that she would request the trial court to instruct Brent that if he purchases Sierra Vista, he must refinance or pay off the Provident mortgage, as a condition of the close of escrow, to allow the administration of the trust to be brought to a timely close.

Classen also clarified her position as to the petition allegation that she refused to bring an action on behalf of the trust against Brent, stating that her review of the trust documents led her to conclude she "did not have enough good evidence to support an action by the [t]rust against Brent [] with respect to either the [] Note or the Agreement." Nor did Classen's review of the trust file lead her to conclude the trust had suffered damages as a result of Brent's conduct, as alleged in the petition. Classen stated that if the petition claims are found to be meritorious, she will "fully and faithfully carry out the terms of any [court] order."

### 3. Bench Trial

In September 2022, the trial court held a nine-day bench trial on the petition. The court heard evidence from both sides, including expert testimony regarding the disputed issues of the Note payments and the appraisal value of Sierra Vista, and received written closing briefs from the parties following the close of evidence.

Appellants' theory at trial was that Sherry trusted Brent and looked to him to help monetize Sierra Vista when she decided to move to Santa Rosa, but he took advantage of her vulnerable position to benefit himself and Chase. Appellants asserted that Brent persuaded Sherry at the January 10, 2017 meeting with attorney Reese to accept the Agreement notwithstanding her reluctance and pressured her to extend the Note and reduce the interest rate on it after it had come due. Appellants maintained that given the admitted, confidential relationship between Brent and his mother, Brent could not meet his burden at trial to prove both the Agreement and the third amendment to the Note were fair and in good faith in all respects.

Respondents Brent and Chase countered that this litigation was not brought to protect the interests of Sherry, whom Craig and Jodi conceded had capacity at the time she entered into the transactions with Brent, but was fueled by Craig's long-held animosity toward Brent. Respondents maintained that the evidence showed Sherry was a sharp-minded and strong-willed individual who was not unduly influenced by Brent (or anyone else) and that the Note amendments and Agreement were fair in all respects to her. Respondent Classen, represented by separate counsel, conceded that she was a "necessary party" to the proceedings and attributed the litigation to "decades old family slights and wrongs among the siblings, which . . . are driving this matter to trial."

4. Statement of Decision and Judgment

On January 23, 2023, following the filing of objections and responses to its tentative decision and proposed statement of decision, the trial court issued its final statement of decision denying Craig and Jodi relief on all claims.

The statement of decision summarized the disputed transactions. Regarding the Agreement, the trial court rejected appellants' characterization of the underlying evidence and found that Craig's attempts to dissuade Sherry "did not impact Sherry's commitment to the [Sierra Vista] transaction." Rather, the court found that "without fully educating himself on the transaction, Craig continued his attack on Sherry," yet "Sherry still did not budge, but rather inquired into Craig's unresolved childhood hurts and considered removing [him] from her trust."

On the Note, the trial court determined the Note amendments' "downward adjustment to the interest rate reflect[ed] market conditions but always result[ed] in a higher than market rate for Sherry" and "exceeded the [a]pplicable [f]ederal [r]ate, the rate applied by the IRS between family member loans." The court found the Note "allowed Sherry to receive the benefit of cash flow needed to supplement her income during Sherry's move to Santa Rosa and later move back to Carmel." Regarding the third amendment, the court found that the e-mails between Sherry and Brent confirmed there was a plan to lower the interest rate to 3.5 percent. It noted that while Sherry requested early payoff of the Note in July 2017 when she was seeking options to leave Santa Rosa and return to Monterey, her "living situation and the attendant stresses were remedied in late 2017 with her move back to Carmel." The court further found that although Sherry again requested payoff of the Note in April 2018 "after additional pestering emails from Craig," she signed the third amendment in August 2018, but only after asking Brent if the " 'siblings' had harassed" him further on the Note or the Agreement and "noting a calm in the storm on this topic." It concluded, "similar to the [l]ease [o]ption, Sherry executed [the third amendment] on her terms and on her time."

24

The statement of decision addressed the financial elder abuse and breach of fiduciary duty claims first. The trial court rejected appellants' efforts to portray Sherry as vulnerable to persuasion by Brent. The court found "[w]hile Sherry was in her early 80's at the time of the instant transactions, there was little controversy over Sherry's determination and abilities to manage her own affairs and even the affairs of other elderly friends. . . . She was described as independent in her thinking and management of her financial and other affairs. Sherry's mental abilities were not impaired by alcohol or other infirmities." The court rejected Jodi's and Craig's depiction of their mother as an alcoholic and physically feeble as "not credible." It found that Sherry was not influenced by Brent to sign the third amendment to the Note and/or the Agreement: "Sherry understood the terms of the [l]ease [o]ption sufficiently to know that it would assist her in her goals to move to Santa Rosa, purchase a new home and provide her with freedom from the burdens of significant repairs to and management of Sierra Vista. Not surprisingly[,] given her independent spirit and family dynamics, Sherry signed the [l]ease [o]ption outside of the presence of any of her family members." The court found unpersuasive attorney Reese's testimony that Sherry acquiesced to Brent to sign the Agreement, stating his testimony "is without independent support and [credibility]."

The trial court evaluated the fairness of the transactions, considering the terms of the agreements and economic results of each. It viewed the Agreement's terms "along with Sherry's other desires that Brent's confidential relationship required him to balance," including that she did not want to pay taxes on Sierra Vista, wanted to keep the home in the family, and wanted to simplify her life and be relieved of the stress of maintaining the property. It noted that Sherry retained counsel to assist with the

25

transaction and represent Sherry's best interest; the purchase price of $800,000 exceeded the $780,000 appraisal value from 2016; Brent and Chase were required to carry the mortgage, taxes, and insurance, and to pay Sherry the monthly rent payments. Given these facts, the court found that offsets[8] to the purchase price were fair, as were the lease terms, and concluded the Agreement was "fair in all respects."

The trial court further found the economic result of the Agreement "allowed Sherry to accomplish things important to her as she entered her early 80's," including moving into a home near Jodi, then selling that home for a profit and returning to live close to friends at Hacienda Carmel, where she was "relieved of the financial, physical and mental burden of [] Sierra Vista, a home in need of structural repair and attention." The court similarly concluded the third amendment to the Note provided "a fair result" because the longer-term payment supported her mortgage application and the reduced interest rate remained above the applicable federal rate used by the IRS for family transactions.

As for appellants' breach of contract and recission claims, the trial court found the evidence did not support the claims, no consideration was required for the third amendment, the third amendment was in effect at the time of Sherry's death, and there was no default on the Note.

The statement of decision also addressed the status of the Note after Sherry's death. It found that, following the trustee's examination of Note payments and discovery of a calculation error, Brent made final payments on the note in August 2022, of $20,264.72 and $866.38. The trial court credited

---

[8] The offsets were for work completed on Sierra Vista and principal mortgage payments. We examine the trial court's treatment of offsets and modification of the Agreement in our discussion of the Agreement, *post* (pt. II.B.3.).

the evidence produced by Brent of the two additional payments of $5,000 made in 2002. It found the evidence, including the testimony of CPA Ward, supported the trustee's conclusion that the Note had been paid in full and that "prompt payment by Brent of amounts discovered by earlier errors in calculations should not result in the defaulted interest rate of 10 [percent]."

The statement of decision concluded by observing that Sherry "would not have wanted this action to be brought, pitting her children against one another and airing their longstanding differences . . . in a public arena. The claims made in this lawsuit are all denied."

On March 28, 2023, the trial court entered judgment in favor of respondents and against Craig and Jodi on all causes of action. The judgment specified modifications to the Agreement outlined in the statement of decision, authorized Brent's exercise of the purchase option under the Agreement, and addressed timing in the event of an appeal, requiring that if the judgment is affirmed on appeal, Brent must complete the purchase of Sierra Vista and pay in full the balance of the Provident Credit Union mortgage within 90 days after notice of entry of remittitur. The judgment reserved issues related to costs and attorney fees. Appellants timely appealed from the judgment.

### 5. Costs and Attorney Fees

Following entry of judgment, the parties filed competing memoranda of costs and related briefing in support and opposition. Brent, Chase, and the trustee moved for contractual attorney fees, which Craig and Jodi opposed. We describe these motions in more detail in our discussion of the attorney fees and costs appeal, *post* (pt. II.D.).

On July 18, 2023, the trial court issued a written order after hearing, awarding costs to Brent, Chase, and Classen as the prevailing parties and

27

rejecting appellants' request for costs (fees and costs order). The court also awarded attorney fees to Brent, Chase, and Classen. The fees and costs order emphasized that Jodi and Craig did not prevail on any aspect of the lawsuit and reiterated the court's general impressions of the litigation, including that it found the testimony of Brent and Chase to be "very credible" and did not believe the action was brought in good faith by Craig and Jodi, that it was troubled by Craig's "bullying" e-mails to his mother and his use of similar language toward the trustee, and that the lawsuit would not have pleased Sherry.

The fees and costs order awarded Brent $20,945.75 in costs (reduced from $24,772.07) and awarded Chase and Classen their unopposed costs, respectively, of $463.78 and $1,142.93. It granted Brent's motion to strike appellants' memorandum of costs. Regarding contractual attorney fees, it reviewed the legal grounds for awarding fees, addressed the issue of apportionment, and granted all three respondents' attorney fee motions. The trial court apportioned attorney fees and awarded the following amounts: $120,070.76 to Brent, $76,818 to Chase, and $35,851 to Classen. The court amended the judgment to include the fees and costs award.

Appellants timely appealed from the postjudgment order after trial. This court granted trustee Classen's motion that the appeals be decided together.

## II. DISCUSSION

Appellants center their merits appeal on the issue of breach of fiduciary duty. They contend that Brent failed to meet his burden at trial to show the two transactions with his mother were fair and in good faith in all respects. Appellants assert that the "decisive facts" related to these transactions establish as a matter of law that neither was fair or in good faith. They

28

argue that a finding by this court that Brent failed to carry his burden of fairness and good faith with respect to the third amendment to the Note and Agreement necessarily requires reversal of the trial court's decision on appellants' other claims for financial elder abuse, recission of the third amendment, breach of contract, return of trust property, and cancellation of the agreement. Appellants do not specifically challenge the court's conclusion that they failed to establish that Brent committed financial elder abuse.

### A. Standards of Appellate Review

The parties dispute the appropriate standard of review. Our analysis is guided by the following legal principles.

On appeal, we presume the judgment is correct. " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

We review the trial court's factfinding for substantial evidence. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581 (*Schmidt*).) Under the substantial evidence standard of review, "the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings." (*Id.* at p. 582.) "We are required to accept all evidence that supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the judgment." (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213 (*Harley-Davidson*).) " ' "We may not reweigh the evidence and are bound by the trial court's credibility determinations." ' " (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026 (*Gomez*).) In a bench trial, "[t]he fact finder's determination of the

veracity of a witness is final.  [Citation.]  Credibility determinations thus are subject to extremely deferential review."  (*Schmidt*, at p. 582.)

"Under this standard of review, parties challenging a trial court's factfinding bear an 'enormous burden.' "  (*Schmidt, supra,* 44 Cal.App.5th at p. 582.)  " ' " 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' " ' "[9]  (*Gomez, supra,* 54 Cal.App.5th at p. 1027.)  "If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion."  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted (*Bowers*).)  " ' "[F]indings of fact are liberally construed to support the judgment." ' "  (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102 (*Tribeca*).)

On the other hand, "[w]hen the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court."  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 (*Ghirardo*).)  The effect or legal significance of undisputed facts is a question of law.  (*Gomez, supra,* 54 Cal.App.5th at p. 1026; *Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 74, fn. 7.)  We review any questions of law de novo.  (*Gomez*, at p. 1026.)

---

[9] While "[a] party may avoid implied findings in favor of a judgment, and preserve perceived error in a statement of decision, by making specific objections to the statement of decision" (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94), this doctrine is largely inapplicable here.  Craig and Jodi directly challenge the trial court's express findings and the issues on appeal do not turn on implied findings.

30

Finally, where the issue on appeal raises a mixed question of law and fact, the proper degree of deference varies based on the nature of the inquiry. (*Ghirardo*, *supra*, 8 Cal.4th at pp. 800–801; *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

*B. Breach of Fiduciary Duty*

A claim for breach of fiduciary duty is based on the existence of a fiduciary duty, breach, and damage proximately caused by the breach. (*Tribeca*, *supra*, 239 Cal.App.4th at p. 1114.) "The breach of fiduciary duty can be based upon either negligence or fraud, depending on the circumstances." (*Ibid.*)

All parties agree that Brent, as a child in a confidential relationship with his mother, faced a rebuttable presumption of undue influence and thus bore the burden at trial to establish fairness and good faith in all respects as to the transactions between them. The confidential relationship Brent acknowledges he had with his mother is one that " 'exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind.' " (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 337.)

When the trusted partner in a confidential relationship "derives or claims any advantage from the relation, the law places upon him [or her] the burden of showing that the transaction out of which the advantage arose was fair and just and fully understood and consented to by the party confiding in him." (*Bacon v. Soule* (1912) 19 Cal.App. 428, 434 (*Bacon*); see also *Cox v. Schnerr* (1916) 172 Cal. 371, 378.) The burden arises from a rebuttable presumption "on such party gaining the advantage to show fairness and good faith in all respects." (*Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 290;

31

see *Leathers v. Leathers* (1946) 77 Cal.App.2d 134, 141; *Krug v. Meehan* (1952) 109 Cal.App.2d 274, 278–279.)

### 1. Substantial Evidence Review

To challenge the trial court's determination that Brent met his burden to show fairness and good faith in all respects as to the two transactions,[10] appellants attempt to recast their arguments concerning the court's factual findings as issues of law. Appellants maintain, citing *Ghirardo* and other cases, that notwithstanding the range of disputed facts and testimony adduced at trial, "the test is whether facts which are 'decisive' of an issue are undisputed, and if so, appellate review involves a question of law." They argue that the " 'decisive' " issues to be examined here "are whether certain 'undisputed and indisputable' facts adduced at trial prevented Brent from meeting his burden of fairness and good faith in all respects as a matter of law." Alternatively, appellants contend there is insufficient evidence to support the court's findings.

Having carefully reviewed the entire record in this case, we disagree with appellants' characterization of certain facts as decisive or the pertinent evidence as undisputed. The evidence presented over nine days of trial was thoroughly contested, and while the e-mail evidence cited by appellants may

---

[10] We reject appellants' contention that the trial court "did not explicitly find" the third amendment fair and in good faith in all respects, or that it failed to expressly make that finding as to certain specific provisions of the Agreement. The statement of decision recognized Brent's burden to show fairness and good faith in all respects as to both the Agreement and the Note and found he met that burden. That is enough for purposes of our review. (See *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 770.)

be described as "undisputed" in terms of its existence and authenticity, the meaning of and intent behind the communications was disputed.

Where conflicting inferences may be drawn, the issue on review is one of substantial evidence. (See, e.g., *Davis v. Shiekh Shoes, LLC* (2022) 84 Cal.App.5th 956, 963.) Appellants' reliance on *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, and other cases pertaining to de novo review is misplaced because those decisions refer to the drawing of legal conclusions from undisputed facts. In *Chateau Chamberay*, for example, "the evidence [wa]s undisputed and *only one reasonable inference* c[ould] be drawn from the evidence" (*id.* at p. 346, italics added), leading the appellate court to conclude that the fact-intensive question of bad faith could be resolved as a matter of law.

Nor does *Ghirardo* dictate the application of de novo review under the circumstances. In that decision, the California Supreme Court applied de novo review to the trial court's finding of usury based on the appellant's acknowledgment that "[t]he 'facts most relevant to this appeal are *undisputed.*' " (*Ghirardo, supra*, 8 Cal.4th at p. 799.) The Supreme Court determined that "whether a transaction is usurious" presents "a mixed question of fact and law" (*id.* at p. 800) requiring the court to exercise its independent judgment about the legal characteristics of the transaction. (*Id.* at p. 801.) Our high court's articulation of the standard of review for a question of mixed law and fact like usury, clarifying that the legal significance to be drawn from undisputed historical facts is an issue for de novo review, does not alter the established principles of substantial evidence review for cases, like this one, that involve conflicting evidence and competing credibility determinations.

We turn to whether substantial evidence in the record supports the trial court's findings as to each of the challenged transactions.

2. Third Amendment to the Note

Appellants assert the third amendment to the Note was unfair to Sherry and not obtained in good faith by Brent because it altered Sherry's rights as set forth in the Note and its prior amendments. They contend that by signing the third amendment, Sherry surrendered to the following changes: (1) an extended due date payment on the outstanding principal of $179,491.61, from July 1, 2017 to November 30, 2019; (2) reduced interest payments from 6 percent to 3.5 percent, starting as of June 1, 2016; and (3) delayed entitlement to 10 percent interest, if Brent failed to pay off the Note by the prior due date of July 1, 2017, due to the reduced interest rate and the amended due date.

Appellants maintain that the trial court's findings of fairness and good faith are "unsupported by any evidence" and contradicted by Sherry's e-mails and letters, which appellants point to as "decisive" evidence that Brent consistently disregarded Sherry's demands regarding the Note until she submitted to his campaign for her to sign the third amendment. They assert that even under substantial evidence review, the evidence is insufficient, given the significant burden on Brent to establish the third amendment was both fair and in good faith in all respects.

Our review of the entire record reveals a far more nuanced picture in which Sherry understood the terms of the Note and actively participated in discussions with Brent about modifying its interest rate and, later, its due date. Sherry understood that these changes enabled Brent to simultaneously assist Chase with the obligations on the Agreement while ensuring Sherry continued to enjoy a reliable stream of income until her death.

34

The trial court found that the third amendment to the Note, considering both the reduced interest rate and the extended term, was fair to Sherry and in good faith in all respects. Construing the evidence in the light most favorable to respondents as the prevailing party, substantial evidence in the record supports this conclusion.

CPA Ward, appellants' designated expert in accounting, testified regarding the Note provisions and Brent's payments on it. The provision that the parties would meet annually to discuss the payment schedule was typical for loans between family members, and Brent provided a life insurance policy for no less than the principal balance, which provided collateral for the Note. The reductions in interest rate on the Note, including under the third amendment, tracked the general trend in interest rates, as evidenced by the applicable federal rates for that time frame. Ward testified that the appliable federal rates are established by the IRS as a "minimum interest rate" for family member loans for transactions where no interest rate is set.

Appellants contend that absent the third amendment, Sherry had the contractual right to 6 percent interest from June 1, 2016, through July 1, 2017, and thereafter had a statutory right to 10 percent default interest after Brent failed to perform by the July 1, 2017, payoff date. They argue that the "dramatic retroactive reduction in Sherry's right to interest on her money" was not fair or in good faith because it was transacted without any consideration, resulting (according to expert testimony at trial) in a combined loss in interest payments (considering both the 6 and 10 percent terms) of $52,000.

Contrary to appellants' contentions, substantial evidence in the record supports the retroactive application of the third amendment, including e-mail communications between Sherry and Brent starting on June 1, 2016, in

35

which Brent referred to their discussions about reducing the interest rate to 3.5 percent, as Sherry had suggested, and extending the note as requested by Chambers in February 2016 in connection with Sherry obtaining the loan for the Santa Rosa condominium purchase. During this exchange, Sherry confirmed her intent to reduce the interest rate on the Note and discussed an extension that "works for both of us," suggesting Brent provide an additional payment on the Note to give Sherry "security now." Brent provided two extra principal reduction payments several months later (in January 2017 and May 2017) of $6,000 each.

The evidence shows that Brent was transparent with Sherry about needing clarity from her on an extension of the Note before they could finalize the Agreement, due to his obligations under each. Sherry brought the draft third amendment in 2016 to her attorney Reese, who in October 2016 helped Sherry assign the Note to her trust. Although Reese could not recall the details of their discussion, he affirmed his deposition testimony that " 'this particular promissory note was part of the overall agreement between Sherry and Brent for the future. And that . . . this was being essentially amended . . . to reflect the objectives that they had moving forward with their agreement.' " Reese testified that the Note "was part of a bigger picture, I understood that." Brent reaffirmed that his mother "enjoyed the income stream from the [] Note and relied on that to be able to pay [off] first Santa Rosa and then Hacienda. It was her means of support and security."

Appellants disregard the benefits to Sherry and point to the overall financial loss to her, since she could have continued to earn 6 percent rather than accept a retroactive reduction to 3.5 percent interest on the amount due on the Note. They assert there was a lack of mutuality, and no benefit or

36

legal consideration to Sherry for executing the retroactive third amendment, which they assert also contradicted Sherry's wishes.

Given the difficult dynamic between the siblings and frequent shifts in Sherry's own priorities as she addressed changes in her health and decided where to live out her remaining years, Sherry's perspective on the Note payoff schedule was, unsurprisingly, not always consistent. Nevertheless, there is ample evidence supporting the trial court's observation that Sherry's adamant requests to Brent in July 2017 to pay off the Note occurred in the context of Sherry seeking to extricate herself from Santa Rosa and move back to the Monterey area. There is evidence that Sherry's additional messages regarding payoff of the Note in March and April 2018 were at least partially directed toward appeasing Craig, who was incensed about Sherry having entered into the Agreement with Brent and insisted that "Brent will rob us all blind."

For example, Sherry forwarded to Craig a copy of her message to Brent demanding payoff, and provided Craig a copy of the handwritten letter she wrote (but never sent to Brent) asserting that "[i]t feels like you ignore my wishes about finances. I want the [Note] DONE!" Despite this period of agitation between Sherry and Brent, Sherry met with Brent frequently after her move to Hacienda Carmel and maintained a loving relationship with him and Chase. Substantial evidence shows that Sherry signed the third amendment, with an effective date of June 1, 2016, only in August 2018, after confirming with Brent a few weeks earlier that his siblings had not given him "any more static" about their agreements. Sherry then placed a copy in her safe, alongside the signed Agreement, where the trustee found it after Sherry's death.

37

Sherry's actions support the trial court's conclusion that Sherry signed the retroactive third amendment after a lengthy process of deliberation and communication with Brent, and after having weathered and considered Craig's suggestions and criticisms regarding her dealings with Brent. These deliberations included Sherry consulting with her attorney, whose handwriting appears on the draft of the third amendment, and who understood that the amendment was part of the "bigger picture." Sherry decided to go forward with the agreed upon reduction in interest and extension of the Note, allowing her to continue receiving monthly payments in the same amount to which she had become accustomed and to go forward with the Agreement as she and Brent had devised it. Because there is evidence supporting the trial court's findings as to fairness and good faith, based on Sherry's desire to make both transactions work, "it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers*, *supra*, 150 Cal.App.3d at p. 874, italics omitted.)

Appellants assign error to the trial court's ruling that no consideration was necessary for the third amendment to the Note. We need not decide whether the court erred on this point, because the record contains uncontested evidence of consideration.

Consideration may be defined as a bargained-for exchange. (See, e.g., *Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1248; *Steiner v. Thexton* (2010) 48 Cal.4th 411, 421; Civ. Code, § 1605.) The record evidence establishes that Brent sought the reduced interest rate and extended payment schedule in connection with his incurring additional obligations to Sherry via the Agreement. Sherry confirmed she "want[ed] it to work" because she loved the Sierra Vista house and wanted Chase to be able to

38

purchase it. She asked for additional security, which Brent later provided. Brent made additional principal reduction payments on the Note in January and May 2017; these are sufficient to constitute consideration for the third amendment.[11]

The cases cited by appellants that emphasize the extensive burden placed on a fiduciary to account for *all* funds received in a challenged transaction do not alter our conclusion that the record in this case supports the trial court's findings. Appellants point to *Kennard v. Glick* (1960) 183 Cal.App.2d 246 (*Kennard*) and *Rosenfeld, Meyer & Susman v. Cohen* (1987) 191 Cal.App.3d 1035 (*Rosenfeld*), in support of their argument that there is no substantial evidence that Brent was fair and acted in good faith *in every aspect* of the third amendment transaction. We conclude these cases are largely inapt.

The authorities relied on by appellants do not involve financial agreements negotiated between family members but rather, in the case of *Kennard*, the misappropriation of funds by an agent to a business, and in *Rosenfeld*, the obligation of partners in a dissolution of the partnership to account for all postdissolution receipts. (*Kennard*, *supra*, 183 Cal.App.2d at pp. 250–251; *Rosenfeld*, *supra*, 191 Cal.App.3d at pp. 1051–1052.) Moreover,

_____

[11] Appellants dispute that this court may find Brent's additional principal reduction payments on the note in January and May 2017 as consideration, since the trial court did not make that express finding after appellants filed objections to the proposed statement of decision on the ground that the court had not addressed the issue of whether the third amendment should be rescinded based on lack of consideration. (See *ante*, fn. 11, regarding the use of implied findings on appeal.) Nevertheless, the additional payments are not disputed and support the conclusion that Brent obtained the reduced interest rate and extension of the timeline for repayment in exchange for taking on greater financial and oversight obligations with respect to Sierra Vista.

these cases reinforce the deferential standard by which we review this substantial evidence challenge. (See, e.g., *Rosenfeld*, at p. 1044.)

Having carefully considered the entire record (*Bowers*, *supra*, 150 Cal.App.3d at p. 873), we conclude that appellants' arguments concerning the lack of evidence to support a finding of fairness and good faith in all respects overlook Sherry's overarching goals for herself, her family, and her estate when entering into the financial arrangements in this case. As the California Supreme Court stated in a decision upholding a mother's gift of all her property to an adult son against a challenge by the other siblings, "[t]o hold that gifts voluntarily made, and with full knowledge of all the facts, and of the nature and effect of the transfer, should be set aside because the donor had divested himself of his property, would be to establish a rule that no man can make a voluntary disposition of his estate except by will." (*Soberanes v. Soberanes* (1893) 97 Cal. 140, 145.)

Accepting the evidence supporting respondents and drawing all reasonable inferences to uphold the judgment (*Harley-Davidson, supra*, 237 Cal.App.4th at p. 213), we decide substantial evidence supports the finding that the reduction in interest rate and extension of the Note term were fair to Sherry and obtained by Brent in good faith because they were part of a bargained-for and agreed-upon "bigger picture." The third amendment maintained and did not diminish the reliable stream of income, allowing Sherry to meet her immediate needs for financial security and independence (i.e., moving to Santa Rosa, then to Hacienda Carmel where she could live comfortably near friends and family), while facilitating Brent's ability to support Chase to fulfill their obligations under the Agreement and freeing Sherry from maintaining and paying for Sierra Vista while fulfilling her goal of keeping the home in the family.

40

### 3. Agreement

Appellants reassert their argument that this court should decide de novo whether the Agreement was fair and in good faith in all respects, since the material terms of the Agreement are not in dispute. We disagree that de novo review applies where the issues of fairness and good faith are not determined solely by the terms of the executed Agreement but by the understanding of the parties and their purpose and intent in establishing the Agreement. Like the third amendment to the Note, the facts relevant to the Agreement and inferences to be drawn from those facts were vigorously contested at trial; we therefore review the trial court's findings for substantial evidence.

The trial court found that the terms of the Agreement had to "be viewed along with Sherry's other desires that Brent's confidential relationship required him to balance." The court was correct to ascertain the elements of fairness and good faith in this context. Sherry's goals for herself and the estate she was leaving to her family are highly relevant to Brent's burden to show "that the transaction out of which the advantage arose was fair and just and fully understood and consented to" (*Bacon*, *supra*, 19 Cal.App. at p. 434) by Sherry.

The trial court reviewed the terms of the Agreement in relation to the factors it deemed relevant to Brent's alleged failure to act in good faith and ensure a fair agreement for Sherry in all respects, including Sherry's desire to move to Santa Rosa and related need to increase her monthly income, keep Sierra Vista in the family, avoid paying capital gains taxes, and simplify her life. Taking into account "all these considerations," it found the Agreement "fair in all respects."

Appellants challenge this determination by contending that the "terms and consequences" of the Agreement each represented "an unfair and/or bad faith advantage gained by Brent (and Chase) over Sherry, all to Sherry's detriment." Appellants specifically challenge Brent's failure to include any " 'true-up' " provision in the Agreement to ensure a fair market price for the Sierra Vista purchase; the application of offsets to the purchase price under the Agreement; and the lack of security on the carryback loan upon exercise of the purchase option.

We are not persuaded that any of these terms or consequences demonstrate a lack of substantial evidence in support of the trial court's findings. Appellants attack what they characterize as Brent's admission that a consequence of the Agreement was that he would not honor the due date of the Note. They assert that Brent imposed, in effect, a de facto additional condition upon the Agreement (i.e., that he would be relieved of his payoff obligations under the Note), even though the Agreement itself contained no such provision and Sherry never agreed to it. Appellants argue that because the Agreement contained an integration clause, only the provisions contained in it may be employed to interpret its intended meaning, precluding any "unwritten covenant" that by adopting the Agreement, Sherry abdicated her rights under the Note.

Based on our review of the record, appellants misconstrue Brent's testimony concerning his dual obligations under the Note and the Agreement. It is clear from early in Brent's and Sherry's e-mail correspondence about a potential Sierra Vista purchase plan that adjusting the Note was a necessary part of the process. Brent raised this point in the initial e-mail proposal to Sherry in May 2016, stating "We should discuss the note, adjust the rate and extend it as you suggested to continue the monthly income stream. Upon

agreement, the note should be amended in writing and signed by both of us as an agreed upon amendment." He raised it again in correspondence the next month, stating that before he could "make final decisions and guide Chase on Sierra Vista, [he] need[ed] to be clear on [Sherry's] intentions on the [Note]" and asked "Do you want it extended or should I start making plans to pay it off next year?"

Brent informed Sherry that "if I am to take on a new obligation (with Chase) on Sierra Vista then I need to be clear on how your Estate will deal with the new Note on Sierra Vista." These communications occurred months before Sherry's attorney helped Sherry and Brent finalize the terms of the Agreement. What is more, Sherry's attorney understood that discussions about the Note were part of the "bigger picture" involving the lease purchase agreement. Far from serving as unauthorized parol evidence on the meaning of the Agreement—the terms of which are unambiguous—these communications are relevant to the modifications that occurred on the Note, culminating in the retroactive third amendment. (See discussion *ante*, pt. II.B.2.)

Appellants also contend there is no evidence to support a finding of fairness and good faith in the Agreement because it contained a predetermined sales price and lacked a " 'true-up' " provision that would have allowed a fair market price for Sierra Vista at the time that Brent exercised the purchase option. They also challenge the provision that certain (enumerated) costs, classified as consideration for the purchase option, would apply to reduce the purchase price. We conclude that neither of these provisions contravenes the substantial evidence in the record supporting the trial court's findings of fairness and good faith.

The trial court found the terms of the purchase option were fair. The court considered the purchase price of $800,000 and base monthly rent to Sherry of $1,961.46 for the first year, an additional $1,058.81 in monthly rent starting in the second year (to be applied toward the purchase price, if exercised), and the requirement that Brent assume all responsibility for mortgage payments, property taxes, and insurance (with the principal balance reduction to be applied toward the purchase price, if exercised), as well as any liability for the property. Substantial evidence supports these findings. The purchase price of $800,000 exceeded the appraisal value based on the independent appraisal by Loorz, obtained by Sherry in June 2016. While appellants point out the later date-of-death appraisals were higher, this fact does not demonstrate the agreed upon price was unfair to Sherry, who expressed in an e-mail to Craig that she was pleased with the price, which gave her more than the appraised value and saved her the significant expense of addressing the foundation repairs. The lease purchase option structure further allowed Sherry to meet her goal of avoiding capital gains taxes on a sale of the home.

Appellants challenge the offsets to the purchase price and the trial court's order modifying those provisions. They contend that allowing payments toward the consideration for the agreement to apply as offsets "fails the test of fairness by any objective standard," as evidenced by the court having "decreed a reformation" of the agreement "by limiting the offsets applicable to the purchase price to subparts (c) and (d) of paragraph [No.] 2 only," which appellants contend had the effect of "deleting paragraph [No.] 6(a)." We disagree that the offset provisions render the Agreement unfair or negotiated in bad faith.

The evidence shows that Sherry entered into the Agreement not to maximize her personal benefit or the value of her estate, but to earn for herself a fair market rate on rent and purchase value while avoiding capital gains taxes and eliminating the stress of property ownership, and at the same time enabling Chase to become a homeowner and continue living in and caring for the house Sherry loved.[12]  The provisions of paragraph Nos. 2 and 6 of the Agreement effectuated that intent by listing detailed consideration for Sherry's grant of the right to purchase and applying some of that consideration against the purchase price.  The paragraph No. 2 consideration payments gave Sherry the security she needed during her lifetime, while the paragraph No. 6 offset provisions made the eventual purchase more affordable and feasible for Chase.  The trial court's "modifications to correct drafting errors" simply reconcile paragraph Nos. 2 and 6, applying the most reasonable interpretation by limiting the offsets only to those specified as written in paragraph No. 2.[13]

---

[12] As an example, when Sherry proposed returning to Sierra Vista after deciding to leave Santa Rosa, she affirmed her desire for Chase to be able to buy the property, stating in an e-mail to Chase that "nothing will change on you being able to buy it" and asking for his and Brent's input on how they could make the transition work.

[13] Under paragraph No. 2 of the agreement, the only payments toward the consideration that are specified to also apply as offsets against the purchase price are those described in subparagraphs (c) and (d), pertaining, respectively, to additional monthly rent payments beginning in August 2017, and payments toward the principal balance reduction on the mortgage. Paragraph No. 6 purports to apply *all* payments toward the consideration, excluding the $80,000 put toward renovations and remodel under paragraph No. 2.a., as a credit against the purchase price, thus appearing to expand the offset categories to payments made under paragraph Nos. 2.b. and 2.e. Recognizing the apparent ambiguity between these provisions, Classen testified to her understanding that "in the writing of this contract some of the

Appellants' additional arguments concerning alleged deficiencies in the Agreement—including that it fails to provide security on the carryback loan once the option is exercised and does not include late fees or any disincentive against late payments—are unpersuasive. Brent testified that although he and attorney Reese discussed securing the Note that would result from Brent's exercise of the purchase option with a deed of trust, it "did not go into the agreement." In response to further questioning by the trial judge, Brent explained that Sherry's attorney omitted the deed of trust after stating his concern that the IRS might view the transaction, if secured by a deed of trust, as a "disguised purchase" and trigger capital gains taxes—the very outcome Sherry wished to avoid. While Brent confirmed the Agreement contained no provision for late fees, appellants have not shown that a late fee penalty is legally required to make an agreement fair.

In short, the parties to the Agreement—Brent and Sherry—understood its purpose was to benefit both Sherry and Chase. Brent's involvement was necessary to ensure Chase's ability to fulfill the obligations under the Agreement and for property tax purposes, necessitating two transfers of the property (one from the trust to Brent, and a second from Brent to Chase). The record reflects that Brent and Chase demonstrated their commitment to that purpose by making all timely payments through the time of trial. Chase bore responsibility for maintenance of the property and any repair costs, which he paid for out of the rent proceeds that remained after paying Sherry, and was liable for any tenant vacancy or damage or destruction to the property. Furthermore, over a year before trial in this case, Brent granted

B's and C's and D's are mixed up." In calculating the offsets to the purchase price, she therefore included only those specified in paragraph No. 2, specifically paragraph Nos. 2.c. and 2.d. Brent testified that he agreed with the trustee's interpretation.

46

his interest in Sierra Vista to Chase, although the grant deed was not recorded because of this litigation. At trial, Chase testified that he was prepared to complete the Sierra Vista purchase within 90 days of entry of judgment.[14]

Based on this evidence, and our review of the entire record, and resolving all conflicts in the evidence and reasonable inferences in support of the trial court's decision (*Gomez, supra,* 54 Cal.App.5th at p. 1027), we conclude substantial evidence supports the court's determination that the Agreement was fair and in good faith in all respects, sufficient to rebut the presumption of breach of fiduciary duty by Brent in the Agreement.

### C. Other Causes of Action Under the Petition

Appellants challenge the trial court's findings on the other causes of action under the petition, asserting that reversal of the judgment as to the breach of fiduciary duty claims arising out of the Note and Agreement transactions would necessarily establish liability and require reversal as to the other causes of action. As to those claims arising out of the third amendment to the Note, namely financial elder abuse (count 5), rescission (count 7), and breach of contract (counts 8 & 9), appellants contend that these claims "are all subject to a partial retrial, limited to issues of damages, should this [c]ourt reverse on the breach of fiduciary duty claim." Appellants similarly contend, as to the claims arising out of the Agreement, namely return of trust property (count 1), financial elder abuse (count 2), and cancellation of the Agreement (count 3), that should this court reverse on the breach of fiduciary duty claim under the Agreement, "retrial regarding

---

[14] Classen testified that although she was opposed to the trust carrying the mortgage under the Agreement, Chase had given notice that he was obtaining separate financing to complete the purchase within 90 days of judgment.

election of remedies and damages for all causes of action arising out of that transaction is appropriate."

Apart from these arguments, appellants do not independently challenge the trial court's detailed findings as set forth in the statement of decision on the causes of action for financial elder abuse, breach of contract, and recission of the Note. Having rejected appellants' primary contentions, we conclude that appellants have not carried their burden on appeal to establish error as to any other aspect of the appeal from the judgment.

*D. Costs and Attorney Fees*

Craig and Jodi appeal from and seek reversal of the fees and costs order in the event this court reverses any portion of the judgment. More specifically, they contend the trial court incorrectly determined Brent to be a prevailing party for purposes of the award of costs and erred by awarding attorney fees to Brent, Chase, and Classen. Appellants do not challenge the costs awarded to Chase and Classen.[15]

1. Governing Principles

Several principles guide our review of appellants' challenge.

---

[15] At oral argument, appellants' counsel asserted that appellants were challenging all aspects of the fees and costs award. This appears to be accurate only insofar as appellants' contention that, in the event this court reverses the judgment, the award of fees and costs must also be reversed. Aside from this general assertion of error, appellants in their briefing did not challenge the award of costs as to the trustee or Chase. Moreover, the record reflects that appellants did not challenge the costs claimed by Chase or Classen in the trial court. " ' "[A]reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court." . . . Such arguments raised for the first time on appeal are generally deemed forfeited.' " (*Truck Ins. Exchange v. AMCO Ins. Co.* (2020) 56 Cal.App.5th 619, 635 (*Truck Ins.*).) Appellants have forfeited any claim of error as to the award of costs to Chase and Classen.

48

"Whether a party to litigation is entitled to recover costs is governed by Code of Civil Procedure section 1032, which provides, in subdivision (b), that '[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.' " (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 606 (*Santisas*).) As defined by the statute, a " '[p]revailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant." (Code Civ. Proc., § 1032, subd. (a)(4).)

" 'Costs are allowances which are authorized to reimburse the successful party to an action or proceeding, and are in the nature of incidental damages to indemnify a party against the expense of successfully asserting his rights.' [Citations.] ' "The theory upon which [costs] are allowed to a plaintiff is that the default of the defendant made it necessary to sue him, and to a defendant, that the plaintiff sued him without cause. Thus the party to blame pays costs to the party without fault." ' " (*DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1147 (*DeSaulles*).)

Although attorney fees are not ordinarily recoverable as litigation costs under Code of Civil Procedure section 1032, they may be recoverable "when the party entitled to costs has a legal basis, independent of the cost statutes and grounded in an agreement, statute, or other law, upon which to claim recovery of attorney fees." (*Santisas*, *supra*, 17 Cal.4th at p. 606, citing Code Civ. Proc., § 1033.5, subd. (a)(10); *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 101.) Code of Civil Procedure section 1021

"permits parties to ' "contract out" of the American rule'[16] by executing an agreement that allocates attorney fees.  [Citations.]  Thus, ' "[p]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." ' " (*Mountain Air, supra*, 3 Cal.5th at p. 751.)

If the litigation sounds in contract, the trial court must examine the scope of the agreement, applying traditional rules of contract interpretation, to determine whether it comes within the scope of Civil Code section 1717. (*Mountain Air, supra*, 3 Cal.5th at p. 752.)  "Where a contract specifically provides for an award of attorney fees, Civil Code section 1717 allows recovery of attorney fees by whichever contracting party prevails, regardless of whether the contract specifies that party."  (*Cargill, Inc. v. Souza* (2011) 201 Cal.App.4th 962, 966 (*Cargill*).)

Civil Code section 1717's "primary purpose . . . is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas, supra*, 17 Cal.4th at p. 610.)  This provision typically comes into play "when a person sued on a contract containing a provision for attorney fees to the prevailing party defends the litigation 'by successfully arguing the inapplicability, invalidity, unenforceability, or nonexistence of the same contract.' " (*Id.* at p. 611.)  In that scenario, courts have held that Civil Code section 1717 "permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed."  (*Santisas*, at p. 611.)

---

[16] "Under the American rule, each party to a lawsuit ordinarily pays its own attorney fees."  (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*).)

Civil Code section 1717's application is limited to attorney fees on a contract claim. (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708 (*Exxess*); *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 408 (*Orozco*).) "If an action asserts both contract and tort or other noncontract claims, [Civil Code] section 1717 applies only to attorney fees incurred to litigate the contract claims." (*Santisas*, *supra*, 17 Cal.4th at p. 615.) "As to tort claims, the question of whether to award attorneys' fees turns on the language of the contractual attorneys' fee provision, i.e., whether the party seeking fees has 'prevailed' within the meaning of the provision and whether the type of claim is within the scope of the provision." (*Exxess*, at p. 708.)

A party's entitlement to contractual attorney fees may be further complicated in a case where, like here, claims for which attorney fees may be recoverable are "joined with a claim for which they are not recoverable." (*Dane-Elec Corp., USA v. Bodokh* (2019) 35 Cal.App.5th 761, 771.) Specifically, appellants alleged along with their other causes of action two counts of financial elder abuse. Pursuant to Welfare and Institutions Code section 15657.5, subdivision (a), financial elder abuse is subject to a unilateral attorney fees provision under which fees are awarded to a prevailing plaintiff, but not to a prevailing defendant. (*Wood v. Santa Monica Escrow Co.* (2007) 151 Cal.App.4th 1186, 1191 (*Wood*).) Respondents are therefore not entitled to fees for prevailing on the causes of action for financial elder abuse. (*Id.* at p. 1190.)

2. Additional Background

a. Costs

On March 30, 2023, Brent filed a memorandum of costs seeking $24,772.07. Craig and Jodi filed a motion to strike, or in the alternative, tax

51

costs.  They argued that as a result of this litigation, they recovered a " 'net monetary recovery' " on behalf of the trust after their expert witness calculated that Brent owed amounts due on the Note, leading Brent to make payments prior to trial of $20,264.72 and $866.38.  Craig and Jodi asserted that because of this recovery for the trust, they, not Brent, are entitled to costs.  Brent filed opposition to the motion, arguing that his "voluntary payment made after discovering a mistake . . . in calculating the amount due for the [] Note" is not a " 'net monetary recovery' " within the meaning of Code of Civil Procedure section 1032, subdivision (a)(4) (hereafter, section 1032(a)(4)).

Craig and Jodi filed their own memorandum of costs on April 7, 2023, seeking $20,083.65.  Brent moved to strike the memorandum of costs, asserting Craig and Jodi are not the prevailing party within the meaning of section 1032(a)(4).

As stated *ante* (pt. I.B.5.), the trial court rejected the prevailing party argument advanced by Craig and Jodi.  In its fees and costs order, the court granted Brent's motion to strike their memorandum of costs and awarded costs to Brent, Chase, and Classen.

### b.  Attorney Fees

On April 20, 2023, Brent and Chase moved for contractual prevailing party fees.  They asserted generally that as the prevailing party in the lawsuit, they were entitled to recover fees under the broad attorney fee provisions in the Note and Agreement, and Chase was entitled specifically to recover attorney fees under the Agreement, since it indisputably was prepared to benefit him.  Brent and Chase asserted that the fee clauses in the agreements extend to Chase, Craig, and Jodi as nonsignatory third party beneficiaries of the contracts.  Brent further maintained that he was entitled

52

to "pro rata" attorney fees related to the six causes of action not dependent on elder financial abuse, totaling 75 percent of his total legal fees. (Capitalization & boldface omitted.)

On May 26, 2023, trustee Classen separately moved for prevailing party fees. Classen's motion invoked the trial court's "broad equitable powers to award attorney's fees to trustees who successfully defeat claims brought in bad faith by beneficiaries" and the attorney fee provisions of the Note and Agreement, stating that Classen "stepped into the shoes of Sherry Litchfield . . . and became a party to the two agreements." Classen maintained the actions of appellants were in bad faith, warranting an award of attorney fees under the court's equitable powers, and alternatively asserted that she agreed with and incorporated the Waldman respondents' arguments supporting a contractual fee award.

On June 12, 2023, Craig and Jodi filed their opposition to both fee motions. They asserted a variety of theories in support of their contention that the Waldman respondents are not entitled to any attorney fees under the contracts. With regard to the trustee's equitable arguments in support of her fee motion, appellants maintained they named the trustee only as a nominal defendant—effectively, as a plaintiff[17] who refused to bring the claims on behalf of the trust—and did not act in bad faith in bringing the petition because they had evidence to support their petition for the return of trust property and other claims.

_____

[17] We use the terms "nominal defendant" and "plaintiff" for ease of reference in discussing the trustee's position for purposes of the attorney fees award. We recognize that terminology differs from the party designations in the probate action, in which Brent, Chase, and Classen in her capacity as trustee were named as "respondents" in a petition filed by "petitioners" (here, appellants) Craig and Jodi.

53

On June 26, 2023, the trial court granted the respective fee motions. The court ruled that the "fee provisions in the two subject contracts are not narrowly tailored. Rather, the language of the two provisions is very broad and allows for an award of attorney's fees in contract or in tort to the prevailing parties." It awarded Brent apportioned attorney fees of $120,070.76, representing 75 percent of attorney fees incurred, after determining it is "not impossible to separate the seven causes of action unrelated to elder abuse from the two elder abuse causes of action." The court did not apportion Chase's fee award of $76,818 because there was no elder abuse allegation against Chase. It awarded Classen attorney fees in the amount of $35,851 based on the contractual fee clauses, finding Classen was not merely a nominal defendant. It noted that although the court has broad equitable powers in litigation concerning trusts, it did not base the fee award in equity.

3. Analysis

We review de novo the trial court's determination of the legal basis for an award of attorney fees and for abuse of discretion its determination on the amount and apportionment of fees. (*Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142; see *Mountain Air*, *supra*, 3 Cal.5th at p. 751.)

In its order, the trial court found that Brent and Chase were entitled to recover contractual attorney fees "for actions sounding in both contract and tort" but did not specify whether the contractual fee award encompassed other counts (apart from the exclusion of the financial elder abuse counts). Nevertheless, because the underlying motion for attorney fees asserted that the requested amount included fees relating to the six counts in the petition that did not allege financial elder abuse, we infer that the court's award (reduced by the percentage of fees attributed to the financial elder abuse

54

claims) includes fees for the other six remaining causes of action. In our analysis, we review the basis for a fee award as to the seven non-elder abuse counts—namely counts 1, 3, 4, 6, and 7–9.

Appellants advance multiple bases for reversal of the fees and costs award as to Brent. With respect to costs, appellants contend that the trial court erred in awarding costs to Brent and denying appellants' motions to strike costs because they, not Brent, are the prevailing party in the litigation. As to fees, they contend that the attorney fee provisions do not extend to tort claims or nonsignatories (i.e., appellants). Next, they assert that the financial elder abuse statute precludes awarding attorney fees here, since all the claims in this action arise from the same transactions. Lastly, they assert Brent is not a prevailing party on the contract claims because of amounts he paid the trust prior to trial.

With respect to Chase, appellants reiterate these points as to attorney fees and assert the sole claim against Chase for return of trust property is inextricably linked to the financial elder abuse allegation.

As to the trustee, in addition to these arguments, appellants contend that Classen was a nominal defendant, aligned with them on the claims, and therefore cannot collect attorney fees as a prevailing party.

We begin with the trial court's prevailing party determination.

a. Prevailing Party and Award of Costs to Brent

Appellants contend that the costs award to Brent, and denial of costs to Craig and Jodi, must be reversed because Brent's payment of approximately $21,000 to the trust prior to trial makes Craig and Jodi the "prevailing party" under section 1032(a)(4). Citing *DeSaulles*, *supra*, 62 Cal.4th 1140, appellants observe that a monetary payment is a way to resolve a claim for breach of contract. They assert that Brent delayed paying the full amount

55

owed on the Note and finally did so a few weeks before trial only as "a result of the legal process."

The trial court rejected appellants' contention that Brent's payment several weeks before trial of $21,131.10 on the Note meant that appellants had obtained a "net monetary recovery" and were the " 'prevailing party' " under section 1032(a)(4). The court noted that unlike the plaintiffs in *DeSaulles*, who voluntarily dismissed their claim after accepting a monetary settlement, Craig and Jodi chose not to settle and dismiss their claims based on the Note after being informed of Brent's payment. Instead, appellants continued to seek additional payments on the Note under various theories. Craig and Jodi prevailed on none of those theories at trial and the court entered judgment " 'in favor of [respondents] and against [appellants] on all causes of action and in every respect.' "

We agree with the trial court's assessment that Craig and Jodi are not the prevailing party. Brent's voluntary payment to correct an accounting error discovered through the litigation did not make Craig and Jodi the prevailing party for purposes of awarding costs under section 1032(a)(4), or on the Note breach of contract claims (counts 8 & 9).

The circumstances of this case are not analogous to *DeSaulles*, which held as a "default rule" that, when a defendant pays money to a plaintiff to settle a case, the plaintiff obtains a " 'net monetary recovery,' and a dismissal pursuant to such a settlement is not a dismissal 'in [the defendant's] favor.' (§ 1032(a)(4).)" (*DeSaulles*, *supra*, 62 Cal.4th at p. 1144.) Our high court reached this result based on "[Civil Code] section 1032's basic purpose of imposing costs on the losing party." (*Id*. at p. 1152.) The court reasoned that the statute's definition of " 'prevailing party' " (*ibid*.) "was intended to promote the equitable rule that unsuccessful plaintiffs could not evade the

cost statute by dismissing their suit"—a "rule [that] does not apply to plaintiffs that have achieved some litigation success through settlement of the case." (*Id.* at p. 1153.) The court further held that the term " 'net monetary recovery' " under section 1032(a)(4) includes a monetary settlement "obtained as a means of resolving and terminating a lawsuit." (*DeSaulles*, at p. 1153.) Even "a partial recovery, as long as it is a net monetary recovery, entitles a plaintiff to costs." (*Id.* at p. 1157.)

Unlike in *DeSaulles*, appellants did not obtain Brent's payment of the outstanding amount on the Note in consideration for the dismissal of the breach of contract claims but continued to pursue damages at trial by attempting to show that Brent never made the two $5,000 payments and by asserting he owed 10 percent interest from the date of alleged breach.

Furthermore, the trial court ruled against Craig and Jodi on the breach of contract and other claims, finding that Brent's acknowledgment of a calculation error and correction of the resulting underpayment on the Note did not constitute a breach of contract and crediting Brent's evidence of the additional $5,000 payments made in 2002. Thus, while there was a " 'monetary recovery' " to the trust of approximately $21,000, it did not resolve or terminate the lawsuit, nor did appellants "achieve[] some litigation success through settlement of the case." (*DeSaulles, supra,* 62 Cal.4th at p. 1153.) On the contrary, appellants failed to prove each of their claims, and respondents obtained judgment in their favor " 'on all causes of action and in every respect.' "

We conclude the trial court did not err in deeming Brent to be a prevailing party and in awarding his costs as a matter of right under Civil Code section 1032.

57

b. Award of Attorney Fees to Brent

Appellants challenge the award of attorney fees to Brent, asserting that the relevant fee clauses in the Note and Agreement do not cover tort claims and are inapplicable because neither Craig nor Jodi was a signatory.

In deciding Brent's entitlement to contractual attorney fees under the contracts, we review their language to " 'determine whether the parties entered an agreement for the payment of attorney fees, and if so, the scope of the attorney fee agreement.' " (*Mountain Air*, *supra*, 3 Cal.5th at p. 752.) " ' "[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." ' " (*Ibid*.)  "[W]e also recognize the 'interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates.  (Civ. Code, § 1647).' " (*Ibid*.)  Furthermore, in considering whether a cause of action is " 'on a contract' " within the meaning of Civil Code section 1717, courts look to the pleadings and "overall nature" of the action and the right sued upon.  (*Orozco*, *supra*, 36 Cal.App.5th at p. 410.)

The Note, signed by Brent, contains a fee provision that states, "[s]hould suit be commenced or an attorney employed to enforce the payment of this note, I agree to pay such additional sum, as the court may adjudge reasonable as attorney's fees in said suit."

The Agreement, signed by Brent and Sherry contains a fee provision that states in paragraph No. 15, "[i]n any claim, action or proceeding, including any collection or bankruptcy proceedings, arising out of the enforcement of any provision of this [a]greement, the prevailing party shall be entitled to its reasonable attorneys' fees and costs incurred in that claim, action or proceeding."

Appellants contend that, contrary to the trial court's finding that the fee provisions are "very broad and allow[] for an award of attorney's fees in contract or in tort to the prevailing parties," both fee provisions are limited by the language referring to enforcement of the contracts. Specifically, appellants assert that the Note limits entitlement to attorney fees to a suit "to enforce the payment of this note" and the Agreement to claims " 'arising out of the enforcement of any provision of this Agreement.' "

Two of the four causes of action asserted by Craig and Jodi directly alleged breach of contract based on the Note. Those allegations include that Brent "had not paid the amounts due in the promissory note as amended" by the 2012 and 2016 amendments and "has not paid the amounts owed under the promissory note."

The claims in count 8 for breach of contract under the 2012 amendment to the Note, and in count 9 for breach of contract, in the alternative, under the 2016 amendment, unquestionably sought "to enforce . . . payment of th[e] note" within the plain meaning of the Note fee provision. Although the provision is unilateral, obligating only Brent to pay attorney fees "[s]hould suit be commenced . . . to enforce the payment of this note," Civil Code section 1717 makes that provision reciprocal. (*Santisas*, *supra*, 17 Cal.4th at p. 610; see also *Orozco*, *supra*, 36 Cal.App.5th at p. 407.) Apart from asserting that Brent is not the prevailing party on these claims due to his payment of amounts discovered during litigation to be due under the Note, appellants do not appear to challenge this aspect of the fee award.[18] We therefore conclude that Brent is entitled to attorney fees as the prevailing party for fees incurred in relation to counts 8 and 9.

---

[18] Appellants do not raise a challenge to the attorney fee award based on their status as nonsignatories to the Note.

We next consider Brent's entitlement to attorney fees incurred in defending against appellants' other Note-related claims, including for breach of fiduciary duty (count 6) and rescission (count 7), as well as appellants' general claim for return of trust property (count 1). We reject as forfeited Brent's and Chase's alternative contention—asserted briefly in the Waldman respondents' brief on appeal and raised by counsel at oral argument—that the trial court's broad equitable powers over trusts provides an alternative basis to uphold the attorney fee award, should the contractual basis for the award fail. The Waldman respondents did not make this argument in the trial court, and we decline to address it for the first time on appeal. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [failure to timely assert a right before the tribunal having jurisdiction to determine it may forfeit the right on appeal]; see also *Truck Ins.*, *supra*, 56 Cal.App.5th at p. 635.)

The Note authorizes one-way reasonable attorney fees, stating "I [Brent] agree to pay such additional sum, as the court may adjudge reasonable" when there is a "suit . . . commenced or an attorney employed *to enforce the payment of this note.*" (Italics added.) Interpreted in its " ' " 'ordinary and popular sense' " ' " (*Mountain Air*, *supra*, 3 Cal.5th at p. 752), this phrasing suggests that attorney fees are available only for fees incurred by the creditor to enforce payment of the Note.

In arguing that this provision is broad enough to encompass the noncontractual causes of action, respondents point to what is generally understood to be courts' liberal construction of the term "on a contract" under Civil Code section 1717. (See *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 240 (*Douglas*); *Orozco*, *supra*, 36 Cal.App.5th at p. 407.) "An action (or cause of action) is 'on a contract' for purposes of [Civil Code] section 1717 if (1) the action (or cause of action)

'involves' an agreement, in the sense that the action (or cause of action) arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement; and (2) the agreement contains an attorney fees clause." (*Douglas*, at p. 242.)

However, "[a]lthough the phrase 'on a contract' in Civil Code section 1717 has been liberally construed, it does not stretch to tort claims." (*Orozco*, *supra*, 36 Cal.App.5th at p. 408.) Tort claims typically enforce a noncontractual duty and " 'are not considered actions on a contract for purposes of [Civil Code] section 1717' " (*ibid*.), even if the parties have a contractual relationship and the cause of action arises out of or is related to the contract. (See *Moallem v. Coldwell Banker Com. Group, Inc.* (1994) 25 Cal.App.4th 1827, 1830 (*Moallem*) [Civil Code section 1717 "has consistently been held not to afford recovery of fees for tort claims arising out of or related to such a contract."].)

Consequently, Brent is not entitled under Civil Code section 1717 to attorney fees related to count 6 for the tort of breach of fiduciary duty. Further, the Note's attorney fee clause runs only in favor of the party enforcing payment on the Note (here, appellants) and not to Brent, the obligor on the Note. Thus, even if the language of the fee provision was broad enough to encompass the tort claims (see *Exxess*, *supra*, 64 Cal.App.4th at p. 708), the provision runs only in favor of the party enforcing the Note and cannot support a fee award to Brent. Therefore, we decide the trial court erred in awarding attorney fees related to count 6. We will reverse the fees and costs order and remand to the trial court for determination of the amount of attorney fees attributable to Brent's defense against count 6 and for reduction of Brent's fee award by that amount.

Turning to the seventh count for rescission of the third amendment to the Note, we decide it does not support the recovery of contractual attorney fees. The rescission claim alleges that the third amendment is "void and/or voidable" due to the tortious conduct and lack of independent consideration alleged in connection with the amendment and seeks to rescind the third amendment. This claim appears to satisfy the test articulated in *Douglas* for a cause of action " 'on a contract' " in that it "is based upon, [and] relates to [the] agreement" (*Douglas*, *supra*, 211 Cal.App.4th at p. 242) which contains an attorney fees clause. However, even mutual application of the fee clause pursuant to Civil Code section 1717 would not entitle Brent to attorney fees. As stated *ante*, the Note's fee clause applies narrowly to a "suit . . . commenced or an attorney employed to enforce the payment of this [N]ote." A rescission claim does not seek to enforce payment of a note but instead seeks to void the agreement.[19]

The trial court therefore erred to the extent that the fee award to Brent is based upon fees incurred in defending against the rescission claim in count 7. On remand, the trial court shall determine the amount of attorney fees attributable to Brent's defense against count 7 and reduce the fee award by that amount.

We reach the same conclusion as to any attorney fees incurred in relation to the first count for return of trust property. The claim for return of trust property under Probate Code section 850 touches on all aspects of appellants' lawsuit and cannot be reasonably construed as an effort to seek enforcement of the Note.

---

[19] At oral argument, counsel for the Waldman respondents conceded that the rescission claim does not fall within the scope of the Note's attorney fee clause. Counsel acknowledged the same was true as to count 1 for the return of trust property.

Insofar as specific allegations set forth in count 1 could arguably be construed to enforce rights under the Note by alleging that the "trustee has a claim to personal property held by" Brent pursuant to the Note, and Brent "has failed to pay the amounts owed in the promissory note to the trustee," any fees incurred by Brent on this basis are covered by and duplicative of those incurred on the breach of contract counts. Consequently, the trial court erred to the extent the fee award to Brent is based on count 1. As with counts 6 and 7, the court on remand shall determine the amount of fees attributable to Brent's defense against count 1 and reduce his fee award by that amount.

We next consider the availability of attorney fees to Brent as the prevailing party on the causes of action related to the Agreement—namely, breach of fiduciary duty (count 3), cancellation (count 4), and return of trust property (count 1), insofar as it pertains to Brent's alleged interest in and/or possession of Sierra Vista. Appellants challenge the trial court's interpretation of the Agreement's fee provision as broad enough to encompass an attorney fees award "in contract or in tort." We agree that the broad reference to "any claim, action or proceeding" must be read together with its modifier, "*arising out of the enforcement* of *any provision* of this Agreement." (Italics added.) Interpreted according to its plain and ordinary meaning, the language suggests an intent to limit fee recovery to claims based on or related to enforcement but takes a broad view on enforcement in that it may pertain to "any provision" of the Agreement.

We do not agree with appellants that the language is so narrow as to exclude the noncontractual causes of action. The case authority cited by appellants is inapposite. In contrast to the one-way attorney provision in the Note, the Agreement authorizes reasonable attorney fees to "the prevailing

party." (Cf. *Moallem*, *supra*, 25 Cal.App.4th at p. 1830.) Respondents' entitlement to recover attorney fees is therefore not dependent on Civil Code section 1717 but "turns on the language of the contractual attorneys' fee provision, i.e., whether the party seeking fees has 'prevailed' within the meaning of the provision and whether the type of claim is within the scope of the provision." (*Exxess*, *supra*, 64 Cal.App.4th at p. 708; see also *Santisas*, *supra*, 17 Cal.4th at p. 617.)

We further decide that the nature of appellants' claims and relief sought places the breach of fiduciary duty and cancellation claims within the scope of the Agreement's fee provision. The cases cited by appellants, including *Casella*, *Exxess*, and *Orozco,* are inapposite.

In *Casella*, the Court of Appeal determined the plaintiff's tort claims for wrongful termination in violation of public policy, fraud, and fraudulent inducement of employment in violation of Labor Code section 970 were outside the scope of the applicable attorney fees clause, which contained language that "start[ed] out broadly using the phrase '[i]f any legal action arises under this Agreement' " (*Casella v. SouthWest Dealer Service, Inc.* (2007) 157 Cal.App.4th 1127, 1161), but then narrowed in scope by "limiting the recovery of reasonable attorney fees to those 'incurred *in enforcing* or *attempting to enforce* any of the terms, covenants or conditions.' " (*Ibid*.) The *Casella* court explained that tort claims for wrongful termination in violation of public policy, fraud, and fraudulent inducement of employment in violation of Labor Code section 970 "do not seek to enforce the employment agreement." (*Casella,* at p. 1162.)

In *Exxess*, the prevailing party (a broker who prevailed in obtaining settlement and dismissal of claims arising from a standard commercial lease) sought attorney fees under the lease's fee provision, which authorized

64

reasonable attorney fees to " 'any Party or Broker [who] brings an action or proceeding *to enforce the terms hereof* or *declare rights hereunder.*' " (*Exxess*, *supra*, 64 Cal.App.4th at p. 702, italics added.)  On appeal, the court decided the provision did not encompass the lessee's claims for constructive fraud and breach of fiduciary duty because those claims, which sounded in tort, "were not brought to 'enforce the terms' of the lease." (*Id*. at p. 709.)  The court reasoned that the claims also did not come within the provision "authoriz[ing] attorneys' fees in an action to 'declare rights hereunder' " (*id*. at p. 710), since the tort claims were premised on a duty independent of the terms of the lease.  (*Id*. at p. 711.)  Lastly, the court rejected the broker's argument that its *defense* to the claims was based on the terms of the lease (specifically, "the 'as is' clause"), because even if the broker's defense "had the effect of 'enforc[ing] the terms' of the lease or 'declar[ing] rights [there]under,' [it] did not 'bring[] an action or proceeding' to accomplish those goals." (*Id*. at p. 712.)

The Court of Appeal in *Orozco* reached a similar conclusion in considering the plaintiff restaurateur's fraud claims against the leasing manager.  The court rejected the contention that the fee clause in the lease was broadly worded when "in fact its text limits its application to actions 'arising from the provisions of this Lease or any default hereunder.' " (*Orozco*, *supra*, 36 Cal.App.5th at p. 409.)  Noting that the key question at trial with respect to the fraud causes of action was whether the defendant fraudulently induced the restauranteur into a long-term lease, an issue that did not involve allegations related to the terms of the lease or any alleged breach, the Court of Appeal affirmed the trial court's denial of attorney fees to the plaintiffs under the lease.  (*Id*. at p. 411.)

The fee clause in the Agreement differs from these cases in that it authorizes fees incurred for defending claims "arising out of the enforcement of any provision of this Agreement." " ' "[W]e look to the pleading to determine the nature of plaintiff's claim." ' " (*Amtower v. Photon Dynamics, Inc.* (2007) 158 Cal.App.4th 1582, 1602.) Our review of the petition confirms that both causes of action for breach of fiduciary duty and cancellation do, in fact, "arise[] out of the enforcement of the" Agreement's provisions pertaining to the lease terms, purchase amount, extension terms, and security (or lack thereof) on the carryback loan after exercise of the purchase option.

The petition specifically alleges that Brent breached his fiduciary duty by entering into the Agreement "for the bases discussed in paragraph [No.] 52." That paragraph lists, inter alia, allegedly inequitable terms of the Agreement, such as below market value rent without "true-ups," a purchase amount of $800,000 with no "true-ups" and reductions for rent paid, an unsecured promissory note for the carryback loan after exercise of the option, and so forth. The petition also alleges that Brent "has not paid the $80,000 in consideration listed in the" Agreement. The trustee points out, based on these and other allegations in the petition, that "[a]ppellants varyingly sought to have [the Agreement] voided and to ensure Brent paid $80,000 in cash as his consideration for the option and have a higher sale price and higher monthly rental amount applied, while removing certain of the credits for which the [A]greement provided."

Thus, while Brent's fiduciary duty arose independent of the contract because of his confidential relationship with Sherry, appellants' claim for breach of that duty is largely based on, and therefore arises out of, the enforcement of specific provisions of the Agreement. A similar logic applies to the cancellation cause of action, which the petition states is based on the

66

allegations that the lease purchase agreement is "void and/or voidable" because it was "procured by . . . [Brent]'s breach of fiduciary duty" and because "[Brent] failed to pay the $80,000 as consideration for the [p]urchase [o]ption." The allegation that the Agreement is void and/or voidable due to Brent's alleged failure to pay the agreed-upon consideration is undeniably a claim "arising out of the enforcement of" a provision of the agreement—consideration for the purchase option. (See *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 427 [concluding that an action to have the subject contract declared void and avoid enforcement is "an 'action on a contract' " under Civ. Code, § 1717].)

The same reasoning applies to the claim for return of trust property with respect to the Sierra Vista home. These count 1 allegations challenge Brent's claim of interest in the property through the Agreement, asserting that Brent's interest is void and/or voidable because he "obtained the market rental value of Sierra Vista [] through a below market rental lease" and, inter alia, "failed to pay consideration for the . . . Agreement on the bases alleged below."

We conclude that the attorney fee provision in the Agreement is sufficiently broad to encompass within its scope the breach of fiduciary duty and cancellation causes of action, as well as the return of trust property cause of action insofar as it is based upon Brent's alleged misconduct with respect to the terms of the Agreement regarding the lease purchase option for Sierra Vista. (See *Mountain Air*, *supra*, 3 Cal.5th at p. 760.) The trial court therefore did not err in awarding attorney fees to Brent for his defense to the claims against him asserted in counts 1 (limited to Sierra Vista through the Agreement), 3 and 4.

67

In the alternative, appellants contend that even if the attorney fee provision in the Agreement is broad enough to cover counts 3 and 4, the award was still in error because Craig and Jodi were not signatories to the Agreement.  Respondents counter that appellants are liable under the attorney fees provision based on the principles articulated in *Cargill, supra*, 201 Cal.App.4th 962.  We agree with respondents.

Courts have identified two situations in which a nonsignatory party may be entitled to attorney fees.  "First is where the nonsignatory party 'stands in the shoes of a party to the contract.'  Second is where the nonsignatory party is a third party beneficiary of the contract."  (*Cargill, supra*, 201 Cal.App.4th at p. 966.)  "[A] party not named in the contract may qualify as a beneficiary under it where the contracting parties must have intended to benefit the unnamed party and the agreement reflects that intent."  (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 680.)  Both tests are met here.

"Regarding nonsignatories to a contract with an attorney fees provision, the courts have developed the following rule:  'Where a nonsignatory plaintiff sues a signatory defendant in an action on a contract and the signatory defendant prevails, the signatory defendant is entitled to attorney fees only if the nonsignatory plaintiff would have been entitled to its fees if the plaintiff had prevailed.' "  (*Cargill, supra*, 201 Cal.App.4th at p. 967.)

Appellants maintain that the Agreement causes of action are not " 'on a contract' " as required for application of the rule.  We have already considered and rejected this argument.  Moreover, the terms of the Agreement do not limit the attorney fees provision to the parties to the contract but allow for the recovery of reasonable attorney fees to the prevailing party "[i]n any

68

claim, action or proceeding, . . . arising out of the enforcement of any provision of this Agreement." In addition, appellants' petition specifically pleaded for "costs of suit, including reasonable attorneys' fees" in the prayer for relief.

Having brought their claims as beneficiaries of the trust and because Classen "has refused to bring the petition and claims alleged" in the petition, appellants would have been entitled to fees if they had prevailed. Appellants' status as nonsignatories to the Agreement does not defeat the award of attorney fees to Brent under the Agreement.

Finally, appellants contend that even if this court upholds the contractual basis for the award of attorney fees, the statutory fee-shifting provision applicable to appellants' financial elder abuse claims "precludes any award for contractual attorneys' fees." Appellants maintain the trial court erred in apportioning the fee award to Brent because the fees "arise from the same transaction that gave rise to the financial elder abuse claim." Appellants rely on *Wood*, *supra*, 151 Cal.App.4th 1186 in support of their argument that the fee-shifting statute bars the recovery of contractual fees.

The Waldman respondents agree that they may not recover attorney fees for defending against appellants' elder abuse claims.[20] They assert that, consistent with *Carver v. Chevron U.S.A., Inc.* (2004) 119 Cal.App.4th 498 (*Carver*), which *Wood* relies on as controlling authority, Brent properly sought, and the trial court awarded, "fees that do not 'inextricably overlap' with the one-way fee cause of action."

---

[20] The question of apportionment does not arise with respect to the order granting the trustee's fee request, which arose in connection only with the contract-related causes of action.

69

We review the trial court's determination that the claims were not inextricably intertwined and resulting fee apportionment as to Brent for abuse of discretion. "Once a trial court determines entitlement to an award of attorney fees, apportionment of that award rests within the court's sound discretion." (*Carver*, *supra*, 119 Cal.App.4th at p. 505.)

The parties agree on the applicable law. Welfare and Institutions Code section 15657.5[21] is a unilateral fee-shifting statute that "provides for an award of attorney fees to a plaintiff who prevails on a cause of action alleging financial abuse of an elder adult. There is no reciprocal provision for a prevailing defendant." (*Wood*, *supra*, 151 Cal.App.4th at p. 1188.) Thus, respondents are not entitled to recover fees incurred in defending the financial elder abuse claims. (*Id.* at p. 1191.) The question at issue is whether the trial court's apportionment ruling failed to consider or address whether the claims supporting a fee award arise from the same transaction as the claims which preclude a fee award.

In making this argument, appellants primary rely on *Wood*. *Wood* involved claims including financial elder abuse and breach of contract by the trustee and personal representative of an estate and trust against the defendant escrow company on an allegedly questionable loan. (*Wood*, *supra*, 151 Cal.App.4th at p. 1189.) The defendant moved for an award of attorney fees after the claims against it were dismissed. It argued that it was not

---

[21] Welfare and Institutions Code section 15657.5, subdivision (a) states, "Where it is proven by a preponderance of the evidence that a defendant is liable for financial abuse, as defined in [s]ection 15610.30, in addition to compensatory damages and all other remedies otherwise provided by law, the court *shall award to the plaintiff reasonable attorney's fees and costs*. The term 'costs' includes, but is not limited to, reasonable fees for the services of a conservator, if any, devoted to the litigation of a claim brought under this article." (Italics added.)

required to apportion fees between those incurred defending against causes of action for which fees are awardable (i.e., under the escrow agreement) and those for which fees are not awardable (i.e., financial elder abuse claim) because all causes of action arose from the same transaction. (*Id*. at p. 1190.) The defendant argued that the complete overlap between the compensable and noncompensable claims meant that it should receive the full amount of requested fees. (*Ibid*.) The defendant (the party seeking fees) did *not* request in the trial court that the court apportion fees between the causes of action for which fees were awardable from those that were not. (*Id*. at p. 1192.)

In affirming the trial court's denial of a fee award, the appellate court followed *Carver*, which addressed the effect of a unilateral fee shifting statute in the context of antitrust violations under the Cartwright Act. The court in *Carver* held that where a statute protects an important public policy concern by "expressly authoriz[ing] recovery of attorney fees for prevailing plaintiffs only, a prevailing defendant cannot use an alternative contractual fee provision to claim entitlement to fees for *overlapping* compensable and noncompensable claims." (*Carver*, *supra*, 119 Cal.App.4th at p. 505, italics added.)

The *Wood* court adopted *Carver*'s approach, noting that Welfare and Institutions Code section 15657.5, subdivision (a) "contains the same type of unilateral fee shifting provision." (*Wood*, *supra*, 151 Cal.App.4th at p. 1191.) Given the defendant's concession that the causes of action arose from a single transaction and forfeiture of the issue of apportionment by failing to raise it in the trial court, the court concluded that "all causes of action overlap the elder abuse cause of action" and the defendant "is not entitled to an award of fees." (*Ibid*.)

Appellants assert that here, as in *Wood*, all causes of action arose from the same two transactions: the Agreement and the third amendment to the Note. Moreover, appellants argue that the overlapping nature of the claims and facts supporting those claims made "[a]ny apportionment of fees . . . impossible and improper." They contend the trial court erred as a matter of law by not recognizing the complete overlap between the elder abuse allegations and the other counts.

We agree with appellants that, in cases involving unilateral fee-shifting statutes, prevailing parties may not recover attorney fees for overlapping compensable and noncompensable claims. However, trial courts retain the authority to decide whether claims are sufficiently separate from the noncompensable claims that the prevailing party is entitled to an award of attorney fees for the nonoverlapping claims. (See *Carver*, *supra*, 119 Cal.App.4th at p. 503.)

We review the trial court's decision on apportionment for abuse of discretion. (*Carver*, *supra*, 119 Cal.App.4th at p. 505.) The court addressed the dispute over overlapping claims by applying the principles set forth in *Carver*. The court noted that Brent's counsel submitted a declaration in which he estimated that 25 percent of fees incurred were inextricably intertwined with the financial elder abuse claims. At the hearing Brent's counsel informed the court that "elder abuse" was mentioned only four times during nine days of trial and, in his estimation, the proposed 25 percent reduction "was generous."

The trial court observed that appellants did not submit an alternative to the proposed reduction but instead argued that "no fees are recoverable because all nine causes of action arose from the same two transactions." The court rejected this approach and explained it was not limited to the petition

72

allegations or the statement of decision but would look to the trial to frame the apportionment inquiry.  After examining the evidence and statement of decision, the court concluded based on its "own independent analysis" that of the nine causes of action "it is not impossible to separate the seven causes of action unrelated to elder abuse from the two elder abuse causes of action."

We decide the trial court did not abuse its discretion in rendering its apportionment decision.  As in *Carver*, the court had the benefit of overseeing the trial to evaluate the degree of overlap between claims and the declarations of counsel to assist its consideration of time incurred on claims subject to the fee-shifting provision.  The petition allegations, though relevant to the overall determination, are not determinative.  Moreover, the petition's financial elder abuse allegations centered primarily on the allegation of Brent's undue influence and Sherry's vulnerability, while the breach of fiduciary duty and other claims relied on additional theories and facts.  Implicit in the court's apportionment decision is the finding that the excluded fees are those fees attributable solely to the elder abuse claims *and* those "inextricably intertwined" (*Carver, supra,* 119 Cal.App.4th at p. 506) with them.

In adopting the apportionment proposed by Brent's counsel, the trial court impliedly found the recoverable fees did not overlap with fees incurred in relation to the elder abuse causes of action.  As stated in *Carver*, " 'The court had the discretion to make that determination.' " (*Carver, supra,* 119 Cal.App.4th at p. 506.)  Appellants have not shown the court's apportionment decision to be outside the bounds of reason or based on the application of an erroneous legal standard.

In sum, we conclude that the trial court did not err in awarding contractual attorney fees incurred by Brent under causes of action arising

73

from the Agreement and in relation to the breach of contract causes of action based on the Note. We further conclude that the court did not abuse its discretion in apportioning the award of attorney fees as to Brent to deduct all fees attributable—in whole or in part—to defending against the financial elder abuse claims. Nevertheless, because we also conclude that Brent is not entitled to attorney fees incurred in defending against the claims for breach of fiduciary duty, rescission, and return of trust property in relation to the Note (counts 6, 7, & 1, in part), and the court erred to the extent that it did not deduct from the total awarded fees attributable to those causes of action, we will reverse the fees and costs order and remand to the trial court for determination of the amount of attorney fees due to Brent.

On remand, the trial court shall recalculate the attorney fee award as to Brent based on reasonable fees incurred in defending against the claims set forth in count 1 (return of trust property, only as to Sierra Vista through the Agreement), count 3 (breach of fiduciary duty; Agreement), count 4 (cancellation; Agreement), and counts 8–9 (breach of contract; Note), deducting any fees incurred on the breach of fiduciary duty claim arising from the Note (count 6), rescission of the third amendment to the Note (count 7), return of trust property as related to the Note (count 1, in part), and on any claim inextricably intertwined with the financial elder abuse claims (counts 2 & 5).

c. Award of Attorney Fees to Chase

Appellants challenge the award of attorney fees to Chase on the same grounds asserted as to Brent's fee award under the Agreement—namely, that the fee provision does not authorize prevailing party fees for tort claims, appellants are not signatories to the Agreement, and Civil Code section 1717 does not apply. We reject these arguments for the same reasons set forth in

74

our analysis of Brent's fee award, *ante*. As previously noted, Chase may recover an award of attorney fees as an intended third party beneficiary of the Agreement and based on the language of the Agreement's fee clause. (See *Cargill*, *supra*, 201 Cal.App.4th at p. 970.)

Appellants also contend the fee award to Chase is barred due to overlap between the claim for return of trust property—which brought Chase into the case—and the financial elder abuse allegation. However, in citing the petition allegations, appellants overlook that the return of trust property cause of action is not based only on Brent's alleged commission of financial elder abuse, but "because he committed financial elder abuse, breach of fiduciary duty, and/or failed to pay consideration for the [Agreement] on the bases alleged." Given that the financial elder abuse allegations pertain only to Brent and the trial court found no basis to apportion fees as to Chase, we conclude appellants have not established error in the court's award of fees to Chase or abuse of discretion in the nonapportionment determination. We affirm in full the attorney fee award as to Chase.

d. Award of Attorney Fees to the Trustee

Appellants contend the attorney fee award to Classen should be reversed for the same reasons asserted with respect to Brent and Chase, namely that the attorney fee provisions did not encompass appellants' claims. We reject these arguments for the reasons explained *ante*.

Appellants also challenge the trustee's award of attorney fees on the basis that the trustee was a nominal defendant legally aligned with their position in the litigation who, consequently, could not "[p]revail" over them and be awarded attorney fees as a prevailing party. (Italics & boldface omitted.) They assert that Classen, as trustee, was an indispensable party who had to be joined in the litigation. (See Code Civ. Proc., § 382.) They

75

named her a nominal defendant solely "to afford complete relief and ensure she would receive the trust property" and monies owed "to the trustee" as alleged in the petition. Appellants contend that because a nominal defendant properly joined is effectively a plaintiff, they and Classen were on the same side, precluding an award of contractual attorney fees to her as a prevailing party.

We agree with appellants that, as a matter of law, the trustee's inclusion in the litigation as a nominal defendant precludes her from being a "prevailing party" for purposes of an attorney fees award. Although Classen disputes her characterization by appellants as a nominal defendant whose interests harmonized with theirs, she points to no legal authority—and we are aware of none—that would support a fee award to the nominal defendant in this litigation configuration.

The trial court found that the trustee was not merely a nominal defendant and awarded Classen contractual attorney fees under the Note and Agreement fee provisions based on the same analysis it applied for Brent and Chase. Classen maintains that this was proper under the circumstances, because while purportedly joined as a nominal defendant (i.e., plaintiff), the petition contained "direct allegations of errors by the [t]rustee" and the conduct and course of the litigation "did not align with the [t]rustee or her interests in carrying out the wishes of Sherry as settlor and, in fact" were "hostile to the [t]rustee (and her counsel)." The court entered judgment "in favor of [r]espondents Brent [], Chase [] and [t]rustee [] Classen." Thus, the predicate and rationale for awarding Classen her attorney fees as a prevailing party was that she was named in the petition as a respondent.

This reasoning contravenes well settled principles governing joinder of a nominal defendant pursuant to Code of Civil Procedure section 382. That

76

section states in relevant part, "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint." (Code Civ. Proc., § 382.) Its "purpose is to protect the active parties to a lawsuit by effecting the *involuntary joinder* of a *recalcitrant plaintiff*. This ensures that the party so joined will be bound by any resulting adjudication." (*Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 536 (*Ferraro*).) Courts have long held "that one so joined is a defendant in name only; he or she is ' "in reality" ' a plaintiff." (*Id.*, at p. 537; see *Romero v. Pacific Gas & Electric Co.* (2007) 156 Cal.App.4th 211, 215; *Watkins v. Nutting* (1941) 17 Cal.2d 490, 498 (*Watkins*).) In a case involving damages, " '[a] jury is properly instructed upon the issue of damages suffered by a party joined as a defendant under [Code of Civil Procedure] section 382 even though that "defendant" does not participate in the trial.' " (*Romero*, at p. 215.) Furthermore, judgment is not properly entered against a nominal defendant "because no relief was demanded from them." (*Watkins*, at p. 498.)

Classen seeks to distinguish these cases as personal injury actions, but her position is contrary to case authority addressing the position of a nominal defendant joined pursuant to Code of Civil Procedure section 382 and reiterating that party's treatment as, in effect, a plaintiff. (See, e.g., *Ferraro*, *supra*, 161 Cal.App.4th at p. 537 [rejecting purported entry of default against nominal defendant and noting "[f]or at least 60 years it has been settled that a default cannot properly be entered against such a 'defendant' "]; *Watkins*, *supra*, 17 Cal.2d at pp. 498–499 [holding in wrongful death action that "[n]o judgment could properly be taken against [children of decedent joined as defendants] because no relief was demanded from them, and the order of the court directing the clerk to enter their default was ineffective for any

purpose"]; *Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 994–995 [affirming award of attorney fees to plaintiffs and nominal defendants in action by property owners against municipality for violations of the Political Reform Act related to redevelopment plan].)

Classen does not dispute that appellants joined her as an indispensable party after she declined to bring an action on behalf of the trust. As set forth in the petition, she was "named as a [r]espondent in this action solely in her capacity as trustee." The petition alleges that Classen, "as trustee of the [trust], has refused to bring the petition and claims alleged below." It further alleges in connection with the breach of contract claims that Classen "has performed her obligations" under the 2012 amendment to the Note "or is excused from her nonperformance" and that she, as trustee, "has damages resulting from [Brent's] breach." Contrary to Classen's assertion that the causes of action for breach of contract "contain direct allegations of errors by the [t]rustee," the petition makes no allegations or claims against her.[22] Moreover, the petition seeks no relief *from* the trustee but only relief on her behalf, such as for orders returning the right of possession of Sierra Vista "to the trustee" and "return[ing] to the trustee the amounts owed." We agree

_____

[22] Classen's reference to "direct allegations of errors" is limited to the allegation that Classen, " 'as trustee of the [trust], has refused to bring this breach of contract action against [r]espondent Waldman in breach of trust. Petitioners therefore can maintain the suit by bringing the trustee of the [trust] into this petition along with [r]espondent Brent Waldman.' " Classen appears to construe this as an allegation that she acted in breach of the trust. Appellants assert that the allegation is "simply a pleading requirement to gain standing to bring the [p]etition as 'interested persons' under Probate Code section 48" and under Code of Civil Procedure section 382, which requires the complaint to explain the involuntary joinder. We agree that under the circumstances, the quoted language cannot be construed as a substantive allegation against the trustee, particularly as the petition seeks no relief from her.

with appellants that if Craig and Jodi had prevailed in any of their claims seeking return of trust property and/or damages to the trustee, there would have been no legal basis on which Classen would have been required to pay appellants their attorney fees.

While Classen disagreed with appellants' belief that Brent had engaged in wrongdoing via the Note and Agreement, her posture in the litigation remained that of a nominal defendant. Classen's filings in the trial court confirmed this position. In her declaration in response to the petition, Classen stated that she participated as "a necessary party to this dispute and to assist in its resolution." Her trial brief reiterated that she was "a necessary party" and "unaware of any actionable facts, or causes of action, that pertain to her." The record of growing hostility between the parties and/or their counsel, noted by the court in its fees and costs order in terms of Craig's continued use of "bullying" language in communicating with the trustee—while highly regrettable in tone and no doubt distressing to Classen—does not alter her legal status in the litigation.

We conclude that the trial court misconstrued Classen's position as a nominal defendant. The court erred by treating her, both in the judgment and fees and costs order, as a defendant and prevailing party. Classen's status as a nominal defendant, technically aligned with appellants for purposes of the litigation and solely in her capacity as trustee, necessarily precludes her from being deemed a prevailing party. Accordingly, we will direct the trial court to modify the judgment to remove reference to the trustee as a prevailing party.

In its fees and costs order, the trial court noted that, although the court has broad equitable powers in litigation concerning trusts, it did not base the fee award to the trustee in equity. Our determination that the court erred in

designated Classen as a prevailing party does not alter the award of costs to the trustee (which appellants did not challenge in the trial court and have not challenged on appeal). Nor does it preclude Classen from renewing her claim, upon reversal and remand of the fees and costs order, to attorney fees—chargeable to and to be borne by Craig and Jodi—previously asserted in the trial court under equitable principles. (See *Rudnick v. Rudnick* (2009) 179 Cal.App.4th 1328, 1333–1334.) We express no opinion on the merits of Classen's claim for attorney fees on equitable grounds.

In conclusion, we will reverse the fees and costs order with directions, on remand, for the trial court to determine the amount of reasonable attorney fees as to Brent, consistent with our analysis herein, and to allow the trustee to renew her claim for attorney fees under the court's equitable authority to enforce trusts. Other amounts ordered in the fees and costs order, including costs awarded to Chase and Classen, and the attorney fee award as to Chase, shall remain unchanged.

### III. DISPOSITION

The judgment is reversed. The trial court is directed to vacate its amended judgment of July 18, 2023, and modify it to strike the reference to the trustee Laurie Classen as a prevailing party. In all other respects, the trial court should reenter its judgment.

The July 18, 2023 order on motions for attorney fees and motions to tax costs is reversed. On remand, the trial court is directed to determine any change in the amount of attorney fees awarded to respondent Brent Waldman after deducting fees incurred by him in defending against counts 6, 7, and 1 (as it relates to return of trust property under the Note), and any fees attributable to the financial elder abuse claims (counts 2 & 5). The trial court is further directed to deny attorney fees as to trustee Laurie Classen on

80

the ground that she was named solely as a nominal defendant; however, the court may entertain renewed argument on Classen's previously filed claim to attorney fees on equitable grounds. In its new fees and costs order, in addition to addressing the above, the trial court shall grant as unchanged the award of costs and attorney fees as to respondent Chase Waldman. The trial court shall also grant as unchanged the award of costs to respondent Brent Waldman and trustee Laurie Classen.

Costs on appeal are awarded to respondents in case No. H051091. (Cal. Rules of Court, rule 8.278(a)(1).) The parties are to bear their own costs on appeal in case No. H051414. (*Id.*, rule 8.278(a)(3).)

_____
Danner, Acting P. J.

WE CONCUR:

_____
Wilson, J.

_____
Bromberg, J.

**H051091, H051414**
***Waldman et al. v. Waldman et al.***